**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION**

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| | ) | Case No. BK 15-41915 |
| GAS-MART USA, INC., | ) | (Proposed Lead Case) |
| | ) | |
| Debtor. | ) | Chapter 11 |

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| | ) | Case No. BK 15-41917 |
| AVING-RICE, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| *Joint Administration Requested* | ) | |

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| | ) | Case No. BK 15-41918 |
| FRAN TRANSPORT & OIL CO., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| *Joint Administration Requested* | ) | |

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| | ) | Case No. BK 15-41919 |
| G&G ENTERPRISES, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| *Joint Administration Requested* | ) | |

## EMERGENCY MOTION FOR AUTHORIZATION (A) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. §363, (B) FOR AUTHORITY TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §364, AND (C) FOR RELATED RELIEF

Gas-Mart USA, Inc., debtor and debtor-in-possession, Aving-Rice, LLC, debtor and

debtor-in-possession, Fran Transport & Oil Co., debtor and debtor-in-possession, and G&G

Enterprises, LLC, debtor and debtor-in-possession (collectively referred to herein as "Debtors"[1]),

---

[1] Unless otherwise noted, the use of the term "Debtor" shall refer to each individual debtor comprising the Debtors.

pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364, and Fed. R. Bankr. P. 4001and 9013, and

state and allege as follows:

## **Procedural Background**

1. On July 2, 2015 (the "Petition Date"), Debtors filed four separate voluntary petitions

for relief under Chapter 11 of the Bankruptcy Code in this Court (the "Related Cases") in the

United States Bankruptcy Court for the Western District of Missouri (the "Bankruptcy Court").

2. Each Debtor remains in possession of its assets and continues to operate as debtor-in-

possession in accordance with 11 U.S.C. §§ 1107 and 1108.

3. An Official Committee of Unsecured Creditors has not yet been appointed in any of

the Related Cases.

4. This is a core proceeding pursuant to 28 U.S.C. §157(2)(A).

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334.

6. Venue is proper in this Court pursuant to 28 U.S.C. §1408.

## **Introduction[2]**

7. Gas-Mart was founded in 1995 and completed construction on its first store in early

1996. By 2003, Gas-Mart completed construction from the ground up on seven gasoline

station/convenience stores ("C-Stores") located in and around Kansas City. As a result of these

"greenfield" locations as well as certain acquisitions, the business grew to 18 C-Stores and three

additional vacant sites by the end of 2003. Additional stores have built or acquired since 2003 as

discussed below.

---

[2] A more detailed explanation of Debtors' business operations, current issues, and other pertinent information can be found in the *Declaration of John Tittle, Jr., Chief Executive Officer, In Support Of The Chapter 11 Petitions And First Day Pleadings* filed contemporaneously herewith

8. Gas-Mart and Aving-Rice now own and operate 34 C-Stores. In addition, Gas-Mart presently leases and operates eight C-Stores from independent third parties. With locations in Iowa, Illinois, Indiana, Nebraska, and Wisconsin, Gas-Mart and Aving-Rice operate 22 and 20 C-Stores, respectively, as of the Petition Date. Gas-Mart also owns and operates a wholesale fuel business distributing gasoline and diesel to other C-Stores as well as other third party commercial ventures. Moreover, Aving Rice also owns and operates a full service liquor store that is attached to one of its C-Stores.

9. As of the Petition Date, G&G owns and leases ATM's to the 42 Gas-Mart and Aving-Rice locations as well as certain Phillips66 ("P66") locations in the greater Kansas City Area ("Kansas City"). In May 2015, an office building previously owned by G&G was sold to a third party for $2.3 million including seller financing of $400,000. The balance of the proceeds of $1.9 million was used to satisfy closing costs, taxes, and the secured debt on the property.

10. Fran is a fuel hauling business located in and serving Kansas City. Historically, Fran transported fuel primarily for the Gas-Mart locations in Kansas City after the business was relocated from Omaha, NE in June 2013. Since March 1, 2015, Fran has hauled and delivered fuel for 36 P66 C-Stores in the Kansas City and, since the closing of the sale by Gas-Mart of its 19 Kansas City locations to TravelCenters of America ("TA") on April 30, 2015, discussed further below, Fran now provides hauling services to TA as well. Accordingly, all of the fuel purchased by Gas-Mart and Aving-Rice is transported by common carriers.

11. Debtors currently have over 300 employees, and approximately 700 creditors. Gross revenues for Debtors in 2014 were over $338 million, but with the TA sale, projected gross revenues for 2015 are about $200 million.

12. As discussed earlier, GasMart built or acquired 18 C-Stores from 1996 to 2003. In early 2004, the Gas-Mart acquired 28 sites from P66 located in three states (Illinois, Wisconsin and Indiana). In 2005, a location was built in Kansas City from the ground up on one of the vacant sites purchased in 2003. In 2006, Gas-Mart added seven additional C-Stores, located in two new states (Iowa and Nebraska), as well as a new business line, the distribution of wholesale fuel. The stores acquired in 2004 and 2006, along with certain Gas-Mart stores in Kansas City, were refinanced with a $42 million financing package provided by Sun Life Assurance Company of Canada ("Sun Life") which closed on March 22, 2007. Other individual stores were financed though Sun Life subsequent to placement of the 2007 facility as well as the refinancing of the G&G office building for $2.2 million which occurred on October 5, 2007.

13. Gas-Mart continued its growth in 2012 with the acquisition of 41 locations in Southern Illinois for over $13 million through a newly established entity, Aving-Rice, continuing the use of the trade name "Jumpin' Jimmy's." This transaction was financed through St. John's Bank ("St. John's Bank") and SNC JJ Holdings, LLC, an affiliate of Silver Point Capital ("Silver Point") for about $7 million and $6 million, respectively.   Seven of the Jumpin' Jimmy's locations subsequently were sold.

14. Also in 2012, Gas-Mart added two Kansas Turnpike locations (the "Turnpike Stores"), pursuant to agreements with the Kansas Turnpike Authority (the "KTA"), and managed for P66 an additional 36 stores located in Kansas and Missouri, bringing the Debtors' total store count to 108. The principal investments made by Gas-Mart with regard to the Turnpike Stores included the provision of the pumps, tanks, and canopy as well as all inventories, both inside merchandise and fuel. The structure involved in the managing of the P66 locations evolved over time but could generally be characterized as Gas-Mart managing the locations and providing the

inside merchandise with P66 supplying the fuel, paying the Company a management fee, and both parties dividing the resulting positive cash flow. These locations are characterized by the Company as the "Fee Op Stores." Acquisition of inventory for the Fee Op Stores was a major investment and outlay of cash in late 2013 as the arrangement with the Fee Op Stores evolved.

### Relief Requested

1. Pursuant to and subject to the terms and limitations set forth in the Stipulation and Agreed Order attached and hereby incorporated by reference as Exhibit A (the "Stipulation and Agreed Order"), Debtors request that the Court authorize Debtors to (a) use "cash collateral" of secured creditors subject to providing adequate protection, and (b) obtain senior secured, superpriority post-petition financing consisting of the DIP Facility from the DIP Lender.

2. Pending entry of a final order granting the relief requested herein (the "Final Order"), the Debtors request that the Court authorize the Debtors, on an interim basis, to enter the Stipulation and Agreed Order.[3]

### Known Secured Claims as of the Petition Date

3. As of the commencement of these Chapter 11 Cases, on information and belief, Debtors are aware of seven[4] parties asserting secured claims on various real and personal property assets of Debtors to secure aggregate unpaid claim of around $25 million, as follows[5]:

---

[3] At the time of filing of this Motion, the parties were still in the process of finalizing the Interim Budget referenced in the Stipulated Order and DIP Loan Agreements. Debtors acknowledge and agree that DIP Lender's obligation to fund the obligations and to consummate the Proposed Post-Petition Financing, are subject to the negotiation and execution of a mutually acceptable, definitive, written loan documents, and an Interim Budget that is agreed to by both the DIP Lender and Sun Life.

[4] Debtors note that UCC searches against Debtors' names reveal other possible secured parties. However, Debtors believe that any other parties identified in such searches have been paid in full or have no valid, effective liens as of the commencement of these cases.

[5] Debtors' counsel has not yet completed any review of any loan documents from any of these parties. Accordingly, Debtors reserve the right to assert any objection to any claim or lien asserted by these parties.

a.    Sun Life Assurance Company: $4,683,623.15 in the aggregate principal amount (exclusive of interest and fees accrued and unpaid thereon and other costs, expenses and indemnities) secured by liens on thirteen (13) locations owned by Debtors, including fixtures and an assignment of rents;

b.    UMB Bank, N.A.: $2,818,012.47 in the aggregate principal amount (exclusive of interest and fees accrued and unpaid thereon and other costs, expenses and indemnities) secured by liens on two (2) locations owned by Debtors and a security interest in certain personal property;

c.    St. Johns Bank: $5,815,022.01 (exclusive of interest and fees accrued and unpaid thereon and other costs, expenses and indemnities) secured by liens on eleven (11) locations owned by Debtors and a security interest in certain personal property.

d.    Wells Fargo Bank: $2,602,502.21 (exclusive of interest and fees accrued and unpaid thereon and other costs, expenses and indemnities) secured by some recorded and other unrecorded liens on various real estate and security interests in certain equipment and other personal property;

e.    Silver Point Capital[6]: $5,823,527.91 (exclusive of interest and fees accrued and unpaid thereon and other costs, expenses and indemnities) secured by liens on eight (8) locations owned by Debtors;

f.    Internal Revenue Service: $1,500,000 tax lien on certain assets of Debtors.

g.    Jeff Aldrich: $657,332.23 (exclusive of interest and fees accrued and unpaid thereon and other costs, expenses and indemnities) secured by a lien on one (1) location owned by Debtors.

---

[6] The actual entity asserting the secured claim is SNC JJ Holdings, LLC

## Proposed DIP Facility and Cash Collateral

**A.      Background**

4.      Debtors hereby adopt and incorporate by reference the Declaration of John Tittle, Jr. Chief Executive Officer, in Support of the Petitions and First Day Pleadings ("Tittle Declaration") as if fully set forth herein.

5.      As noted in the Tittle Declaration, Debtors have struggled with cash flow since 2012, ultimately resulting in concentrated efforts to sell a significant part of Debtors' assets in April, 2015. Thereafter, Debtors focused on operation of their remaining locations and determined that filing these cases was necessary and appropriate.

**6.      Earlier this week, Debtors were cut off on new gas deliveries by their primary fuel supplier, Phillips 66. This has left many of Debtors' locations "dry" as Debtors enter the important July 4 holiday weekend. This action, by itself, makes immediate, interim relief under this Motion absolutely critical to Debtors' success.**

**B.      Disclosure Pursuant to Rule 4001 of Material Terms of the DIP Credit Agreement and the Interim DIP Order[7]**

| Provision | Location and Nature |
|---|---|
| (1) Events of Default | Pages 26-28, ¶ 13.  In addition to the events of default listed in Paragraph 13, the Interim Order incorporates by reference events of default under the Loan Agreements. |

---

[7] In case of any discrepancy between the terms of this summary of the Stipulation and Agreed Order and the terms of the Stipulation and Agreed Order, the Stipulation and Agreed Order shall control.

| | |
|---|---|
| (2) Provisions granting a priority or a lien on property of the estate under 11 U.S.C. § 364(c) or (d) or providing adequate protection or priority for a claim that arose before the commencement of the case, including the grant of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim. | Page 13-14, ¶ 4 – Superpriority Claim with priority over any and all administrative expenses.<br><br>Page 14, ¶ 5(a) – First priority, perfected Lien upon all assets that are not otherwise encumbered.<br><br>Page 14, ¶ 5(b) – Second priority, junior perfected Lien upon all assets which is subject to a Permitted Liens; provided, however, that to the DIP Lender Pre-Petition Indebtedness is secured by liens that are senior to the Permitted Liens that such liens will retain their senior and superior status over the Permitted Liens.<br><br>Page 15, ¶ 5(c) – All the Post-Petition Indebtedness and the DIP Lender Pre-Petition Indebtedness up to $2,250,000 shall be secured by a valid, binding, continuing, enforceable, fully perfected first priority senior priming security interest in and lien upon all Primed Collateral whether now or existing or hereafter acquired and all proceeds thereof, and in the proceeds of DIP Collateral secured by Permitted Liens to the extent necessary to secure the repayment of any proceeds of the Post-Petition Financing that are used to satisfy the reasonable and necessary costs and expenses of preserve such collateral to the extent of any direct benefit to any holder of a Permitted Lien<br><br>Page 16, ¶ 6.a. – Replacement liens provided with respect to the use of cash collateral; provided, however, that the Replacement Liens shall be subject and subordinate to the DIP Lender Liens and the Carve-Out. |
| (3) Provisions that prime any properly perfected lien without that lienholder's consent. | Page 15, ¶ 5(c). See Box #2 of the Chart. |
| (4) Provisions that grant cross-collateralization protection to the Lender (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the Lender's lien pre-petition) other than liens granted solely as adequate protection against diminution in value of the Lender's Pre-Petition Collateral. | See Box #2 of the Chart. |
| (5) Provisions regarding the validity, enforceability, priority, or amount of a pre-petition claim, or of any lien securing the pre-petition claim. | Page 9, Recitals L-AA – Concerns amount, validity, priority and enforceability of Lender's claims.<br><br>Page 32, ¶ 20 – Findings contained in recitals shall be binding on Debtors immediately and upon the bankruptcy estates and other parties in interest unless certain action is commenced no later than 45 days after the entry of the final order and the plaintiff in such action is ultimately successful. |
| (6) Provisions regarding a waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien. | Page 17, ¶ 7 – DIP Lender Liens granted pursuant to Interim Order are deemed valid and duly perfected and DIP Lender not required to file or serve financing statements, notices of lien, or similar instruments. |
| (7) Provisions that relate to a sale of substantially all of the Debtors' assets | Page 24, ¶ 11, Page 29, ¶13.t and ¶ 13.u – Addresses Debtors' responsibilities to pursue sale and refinancing opportunities. |
| (8) Provisions for the payment of professional fees of the Debtors or any committee, including any carve-outs for such payments. | Page 21-23, ¶ 9 – The carve-out provisions include: (1) UST Fees and court costs; (2) Debtors' attorneys' fees and expenses; , and (3) the Committee's attorneys' fees and expenses. |

| | |
|---|---|
| (9) Provisions for the payment of pre-petition debt. | Page 23-24, ¶ 10 – Proceeds or payments received by Lender shall be applied to Pre-Petition Indebtedness before the Post-Petition indebtedness. |
| (10) Provisions regarding a waiver or modification of Bankruptcy Code provisions or applicable rules relating to the automatic stay, including provisions that establish procedures or conditions with respect to the same. | Page 25-26, ¶ 15 - Upon the occurrence of the Termination Date and forty-eight hours written notice, the automatic stay shall be deemed lifted and modified.<br><br>Page 29, ¶ 14– Upon the occurrence of a Default or Event Default, the automatic stay is deemed modified to allow Lender to take some action against Debtors upon 48 hours written notice. |
| (11) Provisions containing a waiver or modification of any entity's authority or right to file a plan | Page 26-29, ¶¶ 13.h, 13.k and 13.l, - Events of default dealing with Plans that do not provide for payment in full as of the effective date. |
| (12) Provisions that require or prohibit specific terms in the debtor's plan or that establish that proposing a plan inconsistent with the Interim Order constitutes a default. | See Box 11. |
| (13) Provisions regarding the establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order. | Not applicable. |
| (14) Provisions containing a waiver or modification of any entity's authority or right to request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364. | Page 15-16, ¶ 5(d) – Liens granted to secure Post-Petition Indebtedness shall not be subordinated to or made pari passu with any other lien or security interest.<br><br>Page 19, ¶ 7(f) – Application of loan proceeds secured by Subsequent Liens.<br><br>Page 25, ¶ 12 – Modifying right to use Cash Collateral after the Termination Date.<br><br>Page 28, ¶ 13.o – Event of a default if another claim is granted superpriority status or a lien that is equal or superior to Lender's lien is allowed. |
| (15)  Provisions that address the rights and obligations of guarantors or co-obligors. | Page 6, ¶ O.; Page 31, ¶ 19 |
| (16) Provisions that obligate the debtor to pay any of Lender's professional fees. | Page 29, ¶ 15 – Reimbursement of DIP Lender's and Sun Life fees. |
| (17) Provisions the purport to bind a subsequent trustee. | Page 31, ¶ 18– Continuing Effect of Order<br><br>Page 32, ¶ 20 – Stipulations, Releases and Waivers binding upon all parties in interst upon expiration of challenge period.<br><br>Page 35, ¶ 25 - Binding on the Trustee Provisions of Order binding upon subsequent trustees. |
| (18) Provisions containing a release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action. | Page 22, ¶ 9.c. – Carve-Out monies cannot be used with respect to claims being brought against Lender.<br><br>Page 27, ¶ 16(j) – Event of Default occurs if the Debtors or any other party in interest commence an action adverse to DIP Lender or its rights and remedies under the Interim Order, the Final Order, or any other Bankruptcy Court Order.<br><br>Page 32, ¶ 20 – Release of claims against the DIP Lender, including "lender liability" claims, subject to challenge period. |

| (19) Provisions containing the indemnification of any entity. | TBD |
|---|---|
| (20) Provisions containing a release, waiver, or limitation of any right under 11 U.S.C. § 506(c). | Page 12, ¶ AA.5 – Release related to 506© |
| | Page 28, ¶ 13.r– Event of default occurs if 506(c) claim is asserted. |
| | Page 32, ¶ 20 – Waiver of claims under 506(c). |
| (21) Provisions granting a lien on any claim or cause of action arising under 11 U.S.C. §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a). | Page 14, ¶ 5a – DIP Collateral includes Chapter 5 causes of action and the proceeds thereof. |
| (22) Provisions providing for a waiver or modification of the applicability of nonbankruptcy law. | Page 17, ¶ 7 – Perfection of DIP Lenders Lien |
| | Page 32, ¶ 20 – Release of claims against the DIP Lender, including "lender liability" claims, subject to challenge period. |
| | Page 32, ¶ 20 – Binding nature of the Stipulations, unless an action is commenced by third parties within challenge period. |
| | Page 34, ¶ 21 – Waiver of the equitable doctrine of marshalling. |
| (23) Provisions to remain in effect if interim relief granted, but final relief denied. | Page 30, ¶ 16 – The Lender shall be entitled to all rights, privileges and benefits of the Interim Order with respect to the use of Cash Collateral and Post-Petition Financing incurred by the Debtors pursuant to the Interim Order prior to the stay, modification, reversal or vacation of the same. |
| | Page 31, ¶18 – The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order, including without limitation (a) confirming any plan of reorganization in any of these Chapter 11 Cases (and the Post-Petition Financing shall not be discharged by the entry of any such order or pursuant to Code § 1141(d)(4), the Debtors having hereby waived such discharge); (b) converting any of these Chapter 11 Cases to Chapter 7 cases; or (c) dismissing any of these Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the Superpriority Claims, and DIP Lender Liens granted pursuant to this Interim Order and Loan Agreements shall continue in full force and effect notwithstanding the entry of such order, and such Superpriority Claims, and DIP Lender Liens shall maintain their priority as provided by this Interim Order until all DIP Lender Indebtedness is indefeasibly paid in full and discharged. |
| (24) Post-Petition Financing Fee | Page 21, ¶ 18 - $50,00 |

## C.     The Use of Cash Collateral and Adequate Protection

7.     In order to address its capital needs and fund its restructuring efforts, Debtor also requires the use of cash collateral as defined under Section 363 of the Bankruptcy Code (the "Cash Collateral"). The use of Cash Collateral will provide Debtors with the necessary capital with which to operate its business, pay its employees, maximize value and pursue a reorganization under Chapter 11.

8.     The DIP Lenders have consented to Debtors' use of their Cash Collateral as provided in the Stipulation and Agreed Order. In addition, the DIP Lenders have consented to Debtors' use of the Cash Collateral of any other secured parties as provided in the Stipulation and Agreed Order.

9.     Debtors respectfully submit that the use of Cash Collateral and adequate protection provided n the Stipulation and Agreed Order is consistent with the provisions of the Bankruptcy Code.

## The Proposed DIP Facility Should Be Authorized

10.     Approval of the  DIP Facility will provide Debtors with additional operating cash such that it will be able to avoid:  (a) irreparable harm to the Debtors' business; (b) depletion of going concern value; and (c) jeopardizing Debtors' ability to reorganize and maximize value. Accordingly, the timely approval of the relief requested herein on an interim basis is imperative.

11.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt: (a) with priority over any and all administrative expenses, as specified in Section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. The Debtor proposes to obtain the DIP Facility by providing, *inter alia,* superpriority claims, security interests and liens pursuant to Section 364(c)(1), (2), (3) and Section 364(d) of the Bankruptcy Code.

12.     Due to the exigent facts and circumstances noted herein, Debtors have been unable to seek or procure other post-petition financing, let alone on more favorable terms and conditions than those for which approval is sought herein.

13.     Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under Section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444,449 (D. Colo. 1985).

14.     Furthermore, Section 364(d) does not require that a debtor seek alternative financing from every possible lender. Rather, a debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming of loan was necessary if debtor were to obtain funding).

15. On information and belief, substantially all of Debtors' assets are encumbered by pre-petition liens, and Debtors are unable to procure post-petition DIP financing absent granting the proposed superpriority claims and liens requested herein. Debtors submit that the circumstances of this case require Debtors to obtain the required DIP Facility pursuant to Section 364(c) and Section 364(d) of the Bankruptcy Code and, accordingly, the DIP Facility reflects the exercise of its sound business judgment.

16. The terms and conditions of the DIP Facility are fair and reasonable and were negotiated extensively by well-represented, independent parties in good faith and at arms'-length. Accordingly, the DIP Lenders, and all obligations incurred under the DIP loan documents, should be accorded the benefits of Section 364(e) of the Bankruptcy Code.

## The Use of Cash Collateral Should Be Approved

17. Under Section 363(c)(2) of the Bankruptcy Code, a debtor-in-possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use ... in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Debtor requires the use of Cash Collateral to fund its day-to-day operations. The use of Cash Collateral will enable Debtors to continue to satisfy its vendors, service its customers, pay its employees and operate its business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders. Indeed, absent such relief, Debtors' business will be brought to an immediate halt, with damaging consequences for Debtors and their estates and creditors. Accordingly, Debtors' request to use Cash Collateral in the operation of its business and administration of these Chapter 11 Cases should be approved.

## The Proposed Adequate Protection Should Be Authorized

18.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that
has an interest in property used ... or proposed to be used ... by [a debtor-in-possession], the
court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide
adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code
delineates the forms of adequate protection, which include periodic cash payments, additional
liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate
protection must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396
(10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R.
861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to protect a secured creditor
from diminution in the value of its interest in the particular collateral during the period of use.
*See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of
adequate protection for a creditor is to insure that the creditor receives the value for which he
bargained prebankruptcy.") (internal citation omitted).

19.     Debtors' respectfully submit that the adequate protection proposed in the
Stipulation and Agreed Order is fair and reasonable and sufficient to satisfy the requirements of
Sections 363(c)(2) and (e) of the Bankruptcy Code.

## The Automatic Stay Should Be Modified On A Limited Basis

20.     The relief requested herein contemplates a modification of the automatic stay (to
the extent applicable) to permit the Debtor to: (i) grant the security interests, liens and
superpriority claims described in the Stipulation and Agreed Order, and to perform such acts as
may be requested to assure the perfection and priority of such security interests and liens; (ii)
permit the DIP Lenders to exercise, upon the occurrence of and during the continuance of an

event of default, all rights and remedies under the DIP Facility; and (iii) implement the terms of the proposed DIP Orders.

21.     Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

### Interim Approval Should Be Granted

22.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a Debtors' estates pending a final hearing.

23.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this Motion and:  (a) authorize the Debtors to use the Cash Collateral and borrow under the DIP Facility on an interim basis, pending entry of a final order, in order to (i) obtain the DIP Facility, (ii) maintain and finance the ongoing operations of Debtors pending entry of the Final Order, and (iii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties-in-interest; and (b) schedule a hearing to consider entry of a final order.

24.     Debtors have an urgent and immediate need for cash to continue to operate. Currently, Debtors do not have sufficient unencumbered funds with which to operate their business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on this Motion, the Debtors will be

immediately and irreparably harmed. The availability of use of post-petition secured credit will provide necessary assurance to the Debtors' vendors, employees and customers of its ability to meet its near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of Debtors' business, to the detriment of all parties-in-interest. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors.

25.     To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay under Bankruptcy Rule 6004(h).

### Notice

26.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee (the "U.S. Trustee"); (b) the creditors on the Debtors' list of forty (40) largest unsecured creditors; (c) counsel to the DIP Lenders; (d) all known parties with liens of record on assets of the Debtors as of the Petition Date; (e) the Internal Revenue Service; and (f) all other parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE, Debtors Gas-Mart USA, Inc., Aving-Rice, LLC, Fran Transport & Oil Co., and G&G Enterprises, LLC respectfully pray that this Bankruptcy Court enter an Order granting this Motion in full, and granting any other relief at equity or law this Court deems necessary.

Respectfully submitted this 2nd day of July, 2015.

STINSON LEONARD STREET LLP

By: _/s/ Paul M. Hoffmann_____ ____
Paul M. Hoffmann MO # 31922
Patrick R. Turner NE # 23461 (*pro hac* pending)
Nicholas J. Zluticky MO # 61203
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
paul.hoffmann@stinsonleonard.com
patrick.turner@stinsonleonard.com
nicholas.zluticky@stinsonleonard.com

PROPOSED COUNSEL FOR THE DEBTORS

Exhibit A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE | ) | Case No. BK 15-41915 |
| | ) | (Proposed Lead Case) |
| GAS-MART USA, INC., | ) | |
| | ) | |
| Debtor. | ) | Chapter 11 |

| | | |
|---|---|---|
| IN RE | ) | Case No. BK 15-41917 |
| | ) | |
| AVING-RICE, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| *Joint Administration Requested* | ) | |

| | | |
|---|---|---|
| IN RE | ) | Case No. BK 15-41918 |
| | ) | |
| FRAN TRANSPORT & OIL CO., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| *Joint Administration Requested* | ) | |

| | | |
|---|---|---|
| IN RE | ) | Case No. BK 15-41919 |
| | ) | |
| G&G ENTERPRISES, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| *Joint Administration Requested* | ) | |

## STIPULATION AND INTERIM ORDER (I) AUTHORIZING SECURED POST-PETITION FINANCING ON A SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. § 364, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 363 AND 364, (III) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 363 AND 364, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(C)

Upon the emergency motion (the "Motion") of debtors Gas Mart USA Inc., Aving-Rice

LLC, Fran Transport & Oil Co., and G&G Enterprises, LLC, the Debtors and Debtors in

possession in this case (collectively, the "Debtors"), for authority to obtain Post-Petition

Financing dated July 2, 2015 from UMB Bank, n.a. (the "DIP Lender"); the Court having reviewed the Motion, and considered the evidence presented and arguments of counsel; and for good and sufficient cause appearing therefore, the Court makes the following **FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

**I.      Jurisdiction, Venue and Statutory Predicates**

A.      Debtors commenced the captioned cases by filing their Voluntary Petitions for Relief under Chapter 11 of the Code on July 2, 2015 (the "Petition Date").

B.      The Debtors are continuing in possession of their property, and operating and managing their businesses as a debtors in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

C.      This Court has jurisdiction to hear the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a "core proceeding" within the meaning of 28 U.S.C. § 157.

D.      Venue for the Debtors' bankruptcy cases and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

E.      The statutory predicates for the relief requested in this Motion are sections 105, 363, and 364 of title 11 of the United States Code (the "Code") and the Federal Rules of Bankruptcy Procedure (the "Rules") and the local rules of bankruptcy procedure of this Court (the "Local Rules").

**II.      Definitions**

F.      Capitalized terms used in this Order and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion and/or those certain loan documents and agreements evidencing or securing the Post-Petition Financing between the Debtors and the DIP Lender, including without limitation, the DIP Lender Pre-Petition Loan Agreements and the DIP Loan Agreements (collectively, the "Loan Agreements").

G.     Additionally, for purposes of this Interim Order:

1.     "Adequate Protection Liens" shall refer to any security interests or liens given to a party as adequate protection, pursuant to Code §§ 361, 362, 363 or any other applicable Code provision, including without limitation, the Replacement Liens.

2.     "Avoidance Actions" shall refer to all of the Debtors' claims and causes of actions under Code §§ 502(d), 542, 544, 545, 547, 558, 549, 550, and 553 and any other avoidance actions under the Code, and any proceeds thereof or property received thereby whether by judgment, settlement, or otherwise.

3.     "Collateral" shall collectively refer to the DIP Collateral, the Replacement Collateral granted to DIP Lender in this Interim Order, DIP Lender Pre-Petition Collateral and Cash Collateral as those terms are defined herein.

4.     "DIP Collateral" shall refer to all pre-petition and post-petition property of the Debtors and the Debtors' bankruptcy estates of any nature whatsoever and wherever located, tangible or intangible, whether now or hereafter acquired, whether existing on the Petition Date or thereafter acquired, including without limitation, any and all cash and Cash Collateral of the Debtors and any investment of such cash and Cash Collateral, any goods, inventory or equipment, any accounts receivable, any other right to payment whether arising before or after the Petition Date, contracts, properties, plants, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries and the proceeds, products, offspring or profits of each of the foregoing.

WA 7080269.5

5.     "DIP Lender Indebtedness" shall collectively refer to the Post-Petition Indebtedness and the DIP Lender Pre-Petition Indebtedness as those terms are defined herein.

6.     "DIP Lender Liens" shall collectively refer to the DIP Liens and the DIP Lender Pre-Petition Liens granted to DIP Lender in this Interim Order, as those terms are defined herein.

7.     "DIP Liens" shall refer to the liens and security interests being provided to the DIP Lender under this Interim Order, including, without limitation, the Replacement Liens, to secure the DIP Lender Indebtedness.

8.     "Permitted Liens" shall refer to any deeds of trust, security interests, mortgages, or liens of parties other than the DIP Lender that pursuant to applicable non-bankruptcy law existed and were properly perfected, valid, and enforceable as of the Petition Date (or become properly perfected after the Petition Date under Code § 546(b)), and which are non-avoidable under the Code or applicable non-bankruptcy law, but do not include Adequate Protection Liens.

9.     "Primed Collateral" shall refer to the real property identified on **Exhibit A**, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of away, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, profits, proceeds, rents, income, issues, and other benefits from the such real property including, without limitation, all minerals, oil, gas, geothermal and similar matters and all insurance proceeds and benefits.

4

### III.     Notice and Record

H.      Notice of the Interim Hearing and the relief requested in the Motion has been

provided by facsimile or overnight mail to: (1) the U.S. Trustee ("UST"); (2) counsel, if known,

to the Prepetition Lenders; (3) parties with liens of record on assets of the Debtors as of the

Petition Date; (4) counsel to the DIP Lender; and (5) the Debtors' twenty (20) largest unsecured

creditors, as identified in the Debtors' chapter 11 petitions.

I.      Adequate and sufficient notice of the Preliminary Hearing and the relief requested

in the Motion, as evidenced by the applicable certificates of service filed with the Court and as

stated on the record, have been given in accordance with the provisions of Code §§ 102(1), 363,

364(c) and (d) and Rules 2002, 4001(c), and 4001(d), and the Local Rules. Under the

circumstances, no further notice is required.

J.      At the Preliminary Hearing, the Court considered representations made by

counsel, offers of proof, and/or testimony regarding: (1) The negotiations pertaining to this

Order; (2) the necessity for this Interim Order; (3) the events leading up to the filing of these

Chapter 11 Cases by the Debtors; (4) the Debtors' need for credit to the extent necessary to avoid

immediate and irreparable harm to their estates, pending a final hearing in accordance with Rule

4001(c); and (5) those expenses necessary to avoid immediate and irreparable harm to their

estates.

K.      The Motion contains the necessary findings and disclosures under Rules 4001(c)

and (d).

### IV.     Debtors' Background

#### A.      DIP Lender's Pre-Petition Indebtedness

L.      Prior to the Petition Date, DIP Lender loaned money to one or more of the

Debtors pursuant to the DIP Lender Pre-Petition Loan Agreements.

WA 7080269.5

M.      As of the Petition Date, (1) Debtors were liable to DIP Lender in excess of $2,818,012.47 in the aggregate principal amount (exclusive of interest and fees accrued and unpaid thereon and other costs, expenses and indemnities), and (2) pursuant to the DIP Lender Pre-Petition Loan Agreements, Debtors are liable to DIP Lender for accrued and unpaid interest in addition to all applicable fees, costs, and expenses to the extent allowed under the DIP Lender Pre-Petition Loan Agreements, and applicable law, including, but not limited to attorneys' fees and expenses (collectively, subsections (1), and (2) of this paragraph are the "DIP Lender Pre-Petition Indebtedness").

N.      As security for repayment of the DIP Lender Pre-Petition Indebtedness, Debtors granted DIP Lender security interests in, and liens upon, several pieces of real property, inventory, Chattel Paper, Accounts, Equipment, General Intangibles, and an Assignment of that certain Management Agreement dated as of March 1, 2013, by and between GasMart USA, Inc. and Kansas City Retail and Convenience, LLC, as amended by the Second Amendment to Management Agreement dated October 1, 2013, as more fully described in the DIP Lender Pre-Petition Loan Agreements (collectively, including Cash Collateral (as defined below), the "DIP Lender Pre-Petition Collateral"). Further, Debtors' cash generated from the DIP Lender Pre-Petition Collateral constitutes proceeds of the DIP Lender Pre-Petition Collateral and, therefore, is cash collateral of DIP Lender within the meaning of Code § 363(a) ("Cash Collateral").

O.      As additional security, DIP Lender has the conditional and unlimited Commercial Guaranties (collectively, the "Commercial Guaranties") of The George Irrevocable Trust, James Robert George, David James George, and Michael L. George (collectively, the "Commercial Guarantors").

6                                          WA 7080269.5

**B.** **Debtors' Other Pre-Petition Indebtedness**

    **1.** **Sun Life Assurance Company of Canada**

P.    Prior to the Petition Date, Sun Life Assurance Company of Canada ("Sun Life") loaned money to one or more the Debtors pursuant to the Sun Life Pre-Petition Loan Agreements.

Q.    As of the Petition Date, (1) Debtors were liable to Sun Life in excess of $4,683,623.15 in the aggregate principal amount (exclusive of interest and fees accrued and unpaid thereon and other costs, expenses and indemnities), and (2) pursuant to the Sun Life Pre-Petition Loan Agreements, Debtors are liable to Sun Life for accrued and unpaid interest in addition to all applicable fees, costs, and expenses to the extent allowed under the Sun Life Pre-Petition Loan Agreements, and applicable law, including, but not limited to attorneys' fees and expenses (collectively, subsections (1), and (2) of this paragraph are the "Sun Life Pre-Petition Indebtedness").

R.    As security for repayment of the Sun Life Pre-Petition Indebtedness, Debtors granted Sun Life security interests in, and liens upon, in several pieces of real property as set forth the Sun Life Pre-Petition Loan Agreements (collectively, the "Sun Life Pre-Petition Collateral").

    **2.** **Other Pre-Petition Lenders**

S.    On or about February 3, 2014, the Internal Revenue Service ("IRS") filed a tax lien with the Secretary of State for the State of Kansas and the Register of Deeds, Johnson County Kansas.

T.    In addition to the DIP Lender, Sun Life and the IRS, Enterprise Bank & Trust, Wells Fargo Bank, National Association, St. Johns Bank & Trust Co., Arvest Bank, Equity Bank, First Community Bank, Midwest Equipment Co., Solutions Bank, North American

WA 7080269.5

Savings Bank, F.S.B. and Phillips 66 Company, maintained a lending relationship with one or more of the Debtors and may assert security interests and/or liens in the Debtors' assets (together with DIP Lender, Sun Life, and the IRS, the "Prepetition Lenders").

## C. Debtor-in-Possession Financing

U. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses in the ordinary course of business or operate their businesses and maintain their property in accordance with state and federal law and have commenced the restructuring of their businesses and assets. The access of Debtors to sufficient working capital and liquidity through the use of Cash Collateral, and incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to the Debtors' restructuring efforts.

V. DIP Lender has indicated a willingness to extend post-petition credit up to an aggregate principal amount not to exceed $1,550,000 and accrue interest at the rate of 8.25% per annum subject to the terms and conditions of the DIP Loan Agreements and this Order (the "Post-Petition Financing"). In order to facilitate the Post-Petition Financing and in exchange for the relief and concessions given by the Debtors as set forth herein, Sun Life has agreed, and consents to, DIP Lender having a senior priming lien on the Primed Collateral securing all the Post-Petition Financing as well as the DIP Lender Pre-Petition Indebtedness up to $2,250,000.

W. Debtors have attempted to obtain, but are unable to obtain, working capital financing allowable as an administrative expense under Code § 503(b)(1). Except for the proposed financing from the DIP Lender described herein, the Debtors are also unable to obtain working capital financing (1) allowable with priority as a superpriority administrative expense under Code § 364(c)(1); (2) secured by a senior lien on the Debtors' unencumbered assets under

WA 7080269.5

Code § 364(c)(2); or (3) secured by a junior lien on the Debtors' encumbered assets under Code § 364(c)(3). After considering all alternatives, the Debtors have concluded, in the exercise of their business judgment, that the financing offered by the DIP Lender represents the best working capital financing option. In order to complete their restructuring efforts, the Debtors have an immediate need for the financing set forth in this Order.

X.      The relief requested in the Motion is necessary, essential, and appropriate for the preservation of the Debtors' estates, and is in the best interests of the Debtors, their estates, and their creditors. In the absence of the Post-Petition Financing and the use of Cash Collateral, the restructuring of the Debtors' businesses and assets would not be possible, and would cause serious and irreparable harm to the Debtors and their estates.

Y.      The terms and conditions of the Post-Petition Financing are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

Z.      Based on the record presented to the Court by the Debtors at the Preliminary Hearing, the terms of the Post-Petition Financing as set forth in the Motion, this Order and the Loan Agreements have been negotiated in good faith and at arm's length between the Debtors, the DIP Lender, and Sun Life. The credit to be extended by the DIP Lender pursuant to this Order and the Loan Agreements is being extended in good faith as that term is used in Code § 364(e).

**V.     Stipulations**

AA.     The Debtors, DIP Lender, and Sun Life have agreed to the terms of this Order. Absent the entry of this Interim Order, the DIP Lender would not provide the Post-Petition Financing and Sun Life would not consent to the priming liens addressed herein.   In

consideration of the DIP Lender providing to the Debtors the Post-Petition Financing and extending the use of Cash Collateral and Sun Life agreeing to the priming liens set forth herein, the Debtors, on behalf of themselves and their respective bankruptcy estates:

   1. Stipulate and agree that the DIP Lender Pre-Petition Indebtedness (a) constitutes the legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the automatic stay arising under Code § 362); (b) is now due and owing in its entirety, without any defense, off-set, recoupment, claim, counterclaim, or deduction of any kind or nature whatsoever; (c) is not subject to avoidance, recharacterization, recovery, or subordination pursuant to the Code or applicable non-bankruptcy law; and (d) is oversecured and entitled to the benefits and privileges of the same pursuant to Code § 506(b), including, without limitation, that the DIP Lender Pre-Petition Indebtedness will continue to accrue interest at the rate of 8.25% per annum.

   2. Stipulate and agree that the security interests and liens granted to the DIP Lender by the Debtors prior to the Petition Date in the DIP Lender Pre-Petition Collateral (collectively, the "Pre-Petition DIP Lender Liens"), including, without limitation, any security interests, or liens granted pre-petition pursuant to any security agreement, pledge agreement, deed of trust, mortgage, or other security document executed by the Debtors in favor of the DIP Lender, are (a) legal, valid, binding, perfected, and enforceable, security interests, and liens; (b) not subject to avoidance, recharacterization, or subordination pursuant to the Code or applicable non-bankruptcy law; and (c) subject and subordinate only to any Permitted Liens that, pursuant to applicable law, were in fact

               WA 7080269.5

senior in priority to the Pre-Petition DIP Lender Liens as of the Petition Date except as otherwise provided for by this Interim Order.

      3.     Stipulate and agree that the Sun Life Pre-Petition Indebtedness (a) constitutes the legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the automatic stay arising under Code § 362); (b) is now due and owing in its entirety, without any defense, off-set, recoupment, claim, counterclaim, or deduction of any kind or nature whatsoever; (c) is not subject to avoidance, recharacterization, recovery, or subordination pursuant to the Code or applicable non-bankruptcy law; and (d) is oversecured and entitled to the benefits and privileges of the same pursuant to Code § 506(b); provided, however, that Sun Life will accrue interest on the Sun Life Pre-Petition Indebtedness at the rate of 7% per annum from the Petition Date and that the $1.25 million dollar prepayment indemnity owed by Debtors to Sun Life shall likewise accrue interest at 7% per annum after the Petition Date.

      4.     Stipulate and agree that the security interests and liens granted to Sun Life by the Debtors prior to the Petition Date in the Sun Life Pre-Petition Collateral (collectively, the "Pre-Petition Sun Life Liens"), including, without limitation, any security interests, or liens granted pre-petition pursuant to any security agreement, pledge agreement, deed of trust, mortgage, or other security document executed by the Debtors in favor of the Sun Life are (a) legal, valid, binding, perfected, and enforceable, security interests, and liens; (b) not subject to avoidance, recharacterization, or subordination pursuant to the Code or applicable non-bankruptcy law; and (c) subject and subordinate only to any Permitted Liens or Pre-Petition DIP Lender Liens that, pursuant to applicable

law, were in fact senior in priority to the Pre-Petition Sun Life Liens as of the Petition Date, except as otherwise provided for in this Interim Order.

5. Release and forever discharge the DIP Lender, Sun Life, and their respective officers, directors, shareholders, representatives, agents, attorneys, advisors, employees, insurers, successors, assigns, affiliates, and subsidiaries (collectively, the "Released Parties"), from any and all debts, liabilities, expenses, obligations, claims, counterclaims, charges, actions, damages, rights of action, and causes of action (including any Chapter 5 causes of action under the Code, any so called "Lender liability" claims or defenses; and claims pursuant to Code § 506(c)), of whatever kind or nature, whether known or unknown, developed or undeveloped, anticipated or unanticipated, which arose on or prior to the date this Order; and

6. Waive, as of the Petition Date, the right to (a) challenge the existence, legality, validity, enforceability, or amount of the DIP Lender Pre-Petition Indebtedness, Pre-Petition DIP Lender Liens, Sun Life Pre-Petition Indebtedness, and the Pre-Petition Sun Life Liens; (b) assert defenses, counterclaims, recoupment or setoffs with respect to the DIP Lender Pre-Petition Indebtedness, Pre-Petition DIP Lender Liens, Sun Life Pre-Petition Indebtedness, and the Pre-Petition Sun Life Liens; and (c) seek affirmative relief or bring any claims or causes of action against DIP Lender, Sun Life, or any of the other Released Parties, including, without limitation, any claims or causes of action under Code §§ 506(c), 542, 544, 545, 547, 548, 549, 550, 551, or 553.

The provisions of this Paragraph AA remain subject to the other provisions of this Interim Order.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Motion is granted, subject to the terms and conditions set forth in this Interim Order.

WA 7080269.5

2.     Authorization to Obtain Post-Petition Financing.   The Debtors are hereby authorized to obtain the Post-Petition Financing, use Cash Collateral, and additionally to borrow money and seek other financial accommodations from the DIP Lender after the Petition Date pursuant to the terms and conditions of this Interim Order and the Loan Agreements.  The DIP Lender is authorized to advance funds constituting Post-Petition Financing subject to the terms and conditions of this Interim Order and the Loan Agreements.  The Debtors are authorized to use the proceeds of any loans ("Loans") made under the Post-Petition Financing, to use Cash Collateral and other Collateral (as defined below) strictly as provided for and limited in the Budget for operations of the Debtors' businesses and the administration of these Chapter 11 Cases (all such Loans and diminution from use of Cash Collateral and other Collateral (as defined below) collectively shall constitute, the "Post-Petition Indebtedness"), provided, that the proposed Loans or use of Cash Collateral are consistent with the terms and conditions of the Loan Agreements and this Interim Order and will only be used to pay when due the expenses set forth in the Budget.  Debtors are further authorized to execute all documents reasonably required by the DIP Lender (and, to the extent necessary, Sun Life) in connection with Post-Petition Financing and use of Cash Collateral, including, without limitation, any amendments, modification or change in terms agreements with respect to the same.

3.     Loan Agreement Terms Remain in Full Force and Effect.  During the term of this Order, the terms and conditions of the Loan Agreements shall continue in full force and effect with respect to the DIP Lender Pre-Petition Indebtedness, Loans and other advances under the Post-Petition Financing except as otherwise modified in this Interim Order.

4.     Superpriority Claim.  Pursuant to Code § 364(b), the Post-Petition Indebtedness shall constitute an allowed administrative expense of the Debtors under Code § 503(b)(1).  In

accordance with Code § 364(c)(1), the Post-Petition Indebtedness shall constitute claims (the "Superpriority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to Code §§ 503(b) or 507(b) and all administrative expenses under Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114, subject only to the Carve Out to the extent specifically provided for herein. No cost or expense of administration under the previously referenced Code sections shall be senior to, or *pari passu* with, the Superpriority Claims of the DIP Lender arising out of the Post-Petition Indebtedness, subject only to the payment of the Carve-Out to the extent specifically provided for herein.

     5.       DIP Lender Indebtedness Security.

          a.      Senior Liens on Unencumbered Property. Pursuant to Code § 364(c)(2), the DIP Lender Indebtedness shall be secured by a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon all DIP Collateral, whether now or existing or hereafter acquired and all proceeds thereof, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien in favor of a third party, including, without limitation, the Avoidance Actions.

          b.      Junior Liens on Encumbered Property. Pursuant to Code § 364(c)(3), the DIP Lender Indebtedness shall be secured by a valid, binding, continuing, enforceable, fully perfected junior security interest in and lien upon all DIP Collateral, whether now or existing or hereafter acquired and all proceeds thereof, that, on or as of the Petition Date, that is subject to a Permitted Lien; provided, however, that to the DIP Lender Pre-Petition Indebtedness is secured by liens that are senior to the Permitted Liens that such liens will retain their senior and superior status over the Permitted Liens.

WA 7080269.5

c.     Priming Liens on Encumbered Property. Pursuant to Code § 364(d)(1), and with the consent of Sun Life, all of the Post-Petition Indebtedness and the DIP Lender Pre-Petition Indebtedness up to $2,250,000 shall be secured by a valid, binding, continuing, enforceable, fully perfected first priority senior priming security interest in and lien upon all Primed Collateral whether now or existing or hereafter acquired and all proceeds thereof, and in the proceeds of DIP Collateral secured by Permitted Liens to the extent necessary to secure the repayment of any proceeds of the Post-Petition Financing that are used to satisfy the reasonable and necessary costs and expenses of preserve such collateral to the extent of any direct benefit to any holder of a Permitted Lien. The consent of Sun Life to the priming of the Sun Life Pre-Petition Liens by the DIP Lender Liens and the Carve-Out (defined below) (i) is limited to the Post-Petition Financing authorized under this Interim Order, and shall not extend to any other post-petition financing or to any modified version or replacement of the Post-Petition Financing and (ii) does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by Sun Life that, absent such consent, their interests in the Primed Collateral would be adequately protected pursuant to this Interim Order.

d.     Protection of Priority. The DIP Lender Liens shall not be (i) subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their bankruptcy estates under Code § 551 or (b) any liens arising after the Petition Date including, without limitation, subject to and effective upon entry of the a final DIP Financing Order, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors or (ii) subordinated to or made pari passu with any other lien

or security interest under Code §§ 363 or 364 or otherwise; including, with limitation, the Adequate Protection Liens.

6.      *Authorization to Use of Cash Collateral and Adequate Protection.* Immediately upon entry of this Interim Order, the Debtors are hereby authorized to use Cash Collateral, provided that the Prepetition Lenders are granted the following adequate protection for any diminution in the value of the Collateral resulting from (i) the liens and security interests granted by the Post-Petition Financing and this Interim Order or otherwise pursuant to Code § 364(d); (ii) the Debtors' use of Cash Collateral pursuant to Code § 363(c); (iii) the use, sale or lease of the Collateral (other than Cash Collateral) pursuant to Code §§ 363(b) and (c); and (iv) the imposition of the automatic stay pursuant to Code § 362(a):

a.      *Replacement Liens.*   The Prepetition Lenders are hereby granted a replacement security interests and liens (the "Replacement Lien"), in the same type of assets acquired post-petition by the Debtor that the Prepetition Lenders held a valid security interest or lien in prior to the Petition Date, but only to the same extent and priority of their prepetition security interests and liens ("Replacement Collateral"); provided, however, that the Replacement Liens shall be subject and subordinate to the DIP Lender Liens and the Carve-Out.

b.      *DIP Lender Adequate Protection Payment.* In addition to the other payments required under this Interim Order, Debtors shall pay to DIP Lender regular monthly payments of $31,000 after the Petition Date.

c.      *Sun Life Adequate Protection Payment.* Debtors shall pay to Sun Life regular monthly payments equal to the accrued unpaid post-petition interest accruing at a

WA 7080269.5

rate of 7% per annum, on the Sun-Life Pre-Petition Indebtedness, as of each payment date after the Petition Date.

        d.      Code § 507(b) Diminution Claim. Prepetition Lenders shall be entitled to a super priority administrative claim pursuant to Code § 507(b) for any diminution in its pre-petition collateral position; provided, however, such claim will be subordinate and junior to the DIP Lender's Super Priority Claim for the Post-Petition Financing and the Carve-Out.

        e.      Right to Seek Additional Adequate Protection. The adequate protection granted in this Interim Order is without prejudice to DIP Lender or Sun Life seeking further and other adequate protection during the interim period and/or objecting to the continued use of Cash Collateral at the Final Hearing in this case.

Under the circumstances, the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Lenders; provided, however, that nothing herein contained shall affect or impair the Prepetition Lenders' right to seek additional adequate protection of its interests.

        7.      Perfection of DIP Lender Liens

        a.      Automatic Perfection. The DIP Lender Liens shall be effective and perfected upon the date of this Interim Order without necessity for the execution or recordation of filings of deeds of trust, mortgages, security agreements, control agreements, pledge agreements, financing statements or similar documents, or the possession or control by the DIP Lender of, or over, any Collateral.

        b.      Authorization to File Perfection Documents. The DIP Lender is hereby authorized, but not required, to file or record financing statements, trademark filings,

copyright filings, deeds of trust, mortgages, notices of lien or similar instruments in any

jurisdiction, or to take possession of or control over, or take any other action (including

taking or releasing any liens or pledges granted by this Order) in order to validate and

perfect the DIP Lender Liens granted to it hereunder. Whether or not the DIP Lender

shall, in its sole discretion, chose to file such financing statements, trademark filings,

copyright filings, deeds of trust, mortgages, notices of lien or similar instruments that

may be otherwise required under federal or state law in any jurisdiction, or take any

action, including taking possession, to validate and perfect such interests and liens, such

liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-

avoidable and not subject to challenge dispute or subordination, as of entry of this Interim

Order.

      c.     Debtors' Cooperation. The failure of Debtors to execute any

documentation relating to the enforceability, priority or perfection of the DIP Lender

Liens shall in no way affect the validity, perfection or priority of such liens and security

interests. If the DIP Lender, in its sole discretion, elects to file any financing statements,

trademark filings, copyright filings, deeds of trust, mortgages, notices of lien or similar

instruments, or otherwise confirm perfection of the DIP Lender Liens, the Debtors shall

cooperate with and assist in such process, the stay imposed under Code § 362 is hereby

lifted to permit the filing and recording of a certified copy of this Interim Order or any

such financing statements, trademark filings, copyright filings, deeds of trust, mortgages,

notice of lien or similar instruments, and all such documents shall be deemed to have

been filed and recorded at the time of and on the date of this Interim Order. Upon the

request of the DIP Lender, without any further consent of any party, the Debtors are

 WA 7080269.5

authorized to take, execute, deliver and file such documents (in each case without representation and warranty of any kind) to enable the DIP Lender to further validate, perfect, preserve and enforce the DIP Lender Liens.

      d.      Filing of the Order. A certified copy of this Interim Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, trademark filings, copyright filings, deeds of trust, mortgages, notice of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for titling and recording.

      e.      Depository Accounts. The Prepetition Lenders shall share control with the DIP Lender with respect to each depository account of the Debtors that was subject to a deposit control agreement in favor of a Prepetition Lender as of the Petition Date, and such deposit account control agreements shall hereafter be additionally enforceable by the DIP Lender against, and binding upon, each depository institution party thereto until the DIP Lender Indebtedness is paid in full and the Loan Documents shall have been terminated, after which such deposit account control agreements shall again be solely enforceable by the Pre-Petition Lenders that are a party thereto.

      f.      Subsequent Liens. If, in the course of these Chapter 11 Cases, and contrary to the provisions in paragraphs 5-7, the Court grants liens or security interests to others pursuant to Code § 364(d) or any other provision of the Code, which liens or security interests are senior or equal to the liens or security interests of the DIP Lender in the Collateral (collectively, "Subsequent Liens"), then any proceeds of loans or extensions of credit secured by such Subsequent Liens shall be applied first to payment of

      WA 7080269.5

the DIP Lender Pre-Petition Indebtedness and then to the Post-Petition Indebtedness as set forth in Paragraph 10. DIP Lender shall retain all liens and security interests held by it on the Collateral until the DIP Lender Indebtedness is paid in full.

8.    Budget.

a.    Initial and Proposed Budgets. Attached hereto as **Exhibit B** is a budget for the period from July 2, 2015 through and including August 30, 2015  (the "Initial DIP Budget"), which has been consented to by the DIP Lender and Sun Life. Debtors shall file a (i) proposed budget for the period of August 31, 2015 through January 3, 2016, by August 1, 2015; (ii) a proposed budget for the period of January 4, 2016 through April 3, 2016 by December 1, 2015; and (iii) if the term is otherwise extended pursuant to Paragraph 11.b, a proposed budget for the period of April 4, 2016 through July 3, 2016 by March 1, 2016 (collectively, the "Proposed Budgets"). Prior to filing any Proposed Budget, Debtor shall discuss the same with DIP Lender and Sun Life and shall use best efforts to achieve a consensual budget. Parties in interest will have seven (7) days from the date the Proposed Budgets are filed to object to the Proposed Budgets. If no timely objections are received, then the Proposed Budget will become the final budget for the time period for which it covers (the "Final Budget", together with the Initial DIP Budget, the "Budget"). To the extent that an objection is raised, then the Debtors shall immediately arrange a hearing with the Court prior to the end of the period for which there is a Budget in place.

b.    Authorization to Pay Budgeted Expenses. The Budget reflects, on a line item basis, anticipated cash receipts and expenditures on a weekly basis and includes all necessary and required expenses which Debtors expect to incur during each week of the

WA 7080269.5

Budget. Without prior approval of the Court or the express written consent of DIP Lender and Sun Life, Debtors shall pay the reasonable amounts which are actual, necessary expenses in the operation of its business not to exceed one hundred and ten percent (110%) of the amount stated on any single Budget line item; provided, however, that in no event shall the total amount expended authorized by this Interim Order exceed one hundred and five (105%) of the total amount of expenses stated in the Budget for any given week without prior approval of the Court or the express written consent of DIP Lender and Sun Life; further provided that in no event should Cash Collateral be used to pay pre-petition claims or obligations, other secured claims or obligations to insiders, unless specifically authorized by separate order from this Court and to the extent such payment does not exceed the parameters of the Budget.

9.      Carve-Out. Any provision of this Interim Order or the Loan Agreements to the contrary notwithstanding, the DIP Liens and Superpriority Claims granted to the DIP Lender pursuant to the Loan Agreements and this Interim Order shall be subject and subordinate to a carve out (the "Carve-Out") for:

    a.      UST and Court Fees. Amounts payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a) and any fees payable to the Clerk of the Bankruptcy Court;

    b.       Professional Fees and Expenses. The payment pursuant to Orders of the Court, in form and substance reasonably satisfactory to DIP Lender and Sun Life, of allowed unpaid professional fees, costs and expenses of the retained attorneys by the Debtors or the Committee (the "Professional Fees and Expenses"), only to the extent that such Professional Fees and Expenses:

WA 7080269.5

i.      were incurred or accrued prior to the earlier of (a) the Termination

Date or the expiration of the Initial Term, or, if applicable, the Extended Term, or

(b) receipt by the Debtors post-petition of notice of an Event of Default;

ii.      are in accordance with the Budget;

iii.      do not exceed the following amounts for each respective retained

professional during the Initial Budget:

| Debtors' Counsel | $225,000 |
| Special Counsel | $75,000 |
| Committee Counsel | $50,000 |

Less (A) any unapplied prepetition retainers with respect to each retained

professional, (B) the amounts already paid to such professionals in the Chapter 11

Cases, (C) and any unencumbered funds in the Debtors' estates and the proceeds

of any unencumbered property of the Debtors' estates generally available to pay

such Professional Fees and Expenses. In no event shall any retainers or the Carve

Out be used to pay any fees or expenses arising after the conversion of this

Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code.  Nothing

herein shall be construed as consent to the allowance of any fees and expenses of

a retained professional, or shall affect any party's rights to object to the allowance

and payment of such fees and expense, all of such rights being expressly

preserved.

c.      No Contest Clause. Notwithstanding anything herein to the contrary, no

portion of the Post-Petition Financing or the Carve-Out shall be used or available to pay

Professional Fees and Expenses incurred by any party in connection with the assertion or

joinder in any claim, counterclaim, action, proceeding, application, motion, objection,

WA 7080269.5

defense or other contested matter or adversary proceeding seeking the entry of any order, judgment, or determination (i) challenging the amount, extent, validity, perfection, priority or enforceability of the DIP Liens, Superpriority Claims granted herein to DIP Lender, the DIP Lender Indebtedness, the Pre-Petition Sun Life Liens, and the Sun Life Pre-Petition Indebtedness; (ii) invalidating, setting aside, avoiding, subordinating, or otherwise, affecting the DIP Lender's and Sun Life's claims and interests in the Debtors' cases; (iii) preventing, hindering or delaying the DIP Lender Lender's assertion or enforcement of the DIP Lender Lien Liens or realization upon any Collateral; (iv) preventing, hindering or delaying Sun Life's assertion or enforcement of the Pre-Petition Sun Life Liens or realization upon any Sun Life Pre-Petition Collateral; (v) approving either (A) the sale or other disposition of any Collateral which is not permitted under the Loan Agreements, or (B) the incurrence of any indebtedness which is not permitted under the Loan Agreements or under the Budget, in each case, to the extent the DIP Lenders have not provided their express written consent; or (vi) asserting any other claims or causes of action against DIP Lender.

10.    Application of Payments. Proceeds or payments received by the DIP Lender, or any advances or reserves contemplated herein, shall be applied by the DIP Lender as follows:

    a.    First, to the payment of DIP Lender Pre-Petition Indebtedness;

    b.    Second, to the payment of Post-Petition Indebtedness including all accrued and accruing interest, costs and expenses, including reasonable attorneys' fees; and

    c.    Third, to the payment of the Post-Petition Indebtedness consisting of principal.

WA 7080269.5

11.    Term.

a.    Initial Term. The agreement by the DIP Lender to make any Post-Petition Financing available to the Debtors under the Loan Agreements and to allow the use of Cash Collateral and the Collateral shall continue until and shall include April 3, 2016 or such earlier date as all DIP Lender Indebtedness is paid in full, unless (a) terminated prior to this date upon the occurrence of the Termination Date or (b) otherwise pursuant to the terms of the Loan Agreements or this Interim Order (the "Initial Term"). During the Initial Term, Debtors are required to use commercially reasonable efforts to secure refinancing of the DIP Lender Indebtedness and the Sun Life Pre-Petition Indebtedness and to pursue potential sale opportunities with respect to its assets and/or businesses. Debtors shall provide a report to DIP Lender and Sun Life on the 30th day of each month detailing its efforts to secure refinancing or sale opportunities.

b.    Milestones and Extended Term. Attached as **Exhibit C** is a list of several performance milestones. The performance milestones must be demonstrated to the satisfaction of DIP Lender and Sun Life and verified by an independent third party agreeable to both DIP Lender and Sun Life (if either or both so chose). If Debtors fail to meet the six (6) month performance milestone as set forth in Exhibit C, then Debtors are required to immediately initiate a sale process of their businesses and assets to conclude by the end of the Initial Term. If Debtors accomplish their six (6) month performance milestone, then the Initial Term is automatically extended until July 3, 2016 (the "Extended Term"); provided, however, if Debtors fail to meet the nine (9) month performance milestone as set forth in Exhibit C, then Debtors are required to immediately initiate a sale process of their businesses and assets to conclude by the end of the

WA 7080269.5

Extended Term. During the Extended Term, Debtors must continue to pursue sale opportunities and must pursue exit finance or refinance options on a commercially reasonable best efforts basis, and report to DIP Lender and Sun Life on a bi-weekly basis regarding the progress of such efforts.

12. Termination of Post-Petition Financing and Use of Cash Collateral. If a Default or an Event of Default as defined in the Loan Agreements, or in this Order (other than those Defaults or Events of Default excepted in Paragraph 13 of this Interim Order) occurs, the DIP Lender shall have the right to immediately suspend funding under the Post-Petition Financing after the DIP Lender provides forty-eight (48) hours (the "Notice Period") prior written notice to the Debtors ("Default Notice"), and the DIP Lender may terminate the Post-Petition Financing (the date of any such termination, the "Termination Date") and declare the Loans to be immediately due and payable. Moreover, the automatic stay pursuant to Code § 362(a) shall be deemed lifted and modified, without further order of this Court, to permit the DIP Lender to exercise any and all of its rights and remedies under the Loan Agreements and this Interim Order and to permit Sun Life to exercise any and all of its rights and remedies under the Sun Life Pre-Petition Loan Agreements; provided, however, that the obligations and rights of the DIP Lender and the Debtors with respect to all transactions which have occurred prior to the Termination Date shall remain unimpaired and unaffected by any such termination and shall survive such termination; and provided, further, that upon such termination, the DIP Lender shall be deemed to have retained all of its rights and remedies, including, without limitation, as provided in the Loan Agreements and under the Code and Rules. The Debtors' right to use Cash Collateral shall terminate automatically on the Termination Date; provided, however, that subsequent to the issuance of the Default Notice the Debtors may seek entry of an Order after notice and hearing

WA 7080269.5

allowing use of Cash Collateral and prohibiting the DIP Lender from taking the actions contemplated in this paragraph. Further, this Interim Order is without prejudice to (a) DIP Lender seeking the early termination of the Post-Petition Financing and Debtor's interim use of Cash Collateral prior to the expiration of this Interim Order for cause, including lack of adequate protection or (b) Debtor's opposing such early termination.

13.     Events of Default. An Event of Default under this Order shall include:

a.     The entry of an order dismissing any of these Chapter 11 Cases or converting any of these Chapter 11 Cases to Chapter 7 cases;

b.     The entry of an order appointing a Chapter 11 trustee in any of these Chapter 11 Cases;

c.     The entry of an order granting any other claim a lien equal or superior to the claims and liens granted to the DIP Lender;

d.     The entry of an order staying, reversing, vacating or otherwise modifying the Post-Petition Financing under this Interim Order without the DIP Lender's prior written consent;

e.     The entry of an order in any of these Chapter 11 Cases appointing an examiner having enlarged powers beyond those set forth under Code § 1106(a)(3) and (4);

f.     An Event of Default or Default under the Loan Agreements (except those defaults which arise on account of the Debtors' bankruptcy filings);

g.     Any post-petition material representation or material warranty by the Debtors that is incorrect or misleading in any material respect when made;

WA 7080269.5

h.       There shall occur a material adverse disruption or change in the operation of the Debtors' business and assets or a change of control shall occur other than: (i) with the DIP Lender's consent; or (ii) pursuant to a plan of reorganization or liquidation in which the DIP Lender Indebtedness is repaid in full, on the effective date of such plan unless otherwise consented by the DIP Lender in its sole discretion;

i.       The entry of any order granting any relief from the automatic stay so as to allow a third party to proceed against any material asset or assets of the Debtors, other than relating to assets subject to Permitted Liens which if granted will not materially or adversely affect current operations;

j.       The commencement of any actions adverse to the DIP Lender or its rights and remedies under this Interim Order or any other Bankruptcy Court order;

k.       The entry of an order confirming a plan of reorganization in these Chapter 11 Cases unless such order provides for payment in full in cash of all DIP Lender Indebtedness on or before the effective date of the plan of reorganization (which must be no more than 30 days after the a confirmation order) that is the subject of such order, unless otherwise consented by the DIP Lender in its sole discretion;

l.       The entry of an order confirming a plan of reorganization in these Chapter 11 Cases unless such order provides for payment in full in cash of all Sun Life Pre-Petition Indebtedness on or before the effective date of the plan of reorganization (which must be no more than 30 days after the a confirmation order) that is the subject of such order, unless otherwise consented by Sun Life in its sole discretion;

m.       The failure to pay in full the DIP Lender Indebtedness by the last day of the Initial Term, unless otherwise extended pursuant to Paragraph 11.b;

WA 7080269.5

n.      The expenditures of the Debtors exceed the allowed variances as set forth in Paragraph 8 herein;

o.      Entry of an order granting, or there shall arise, a claim that is equal or senior to the superpriority claims of the DIP Lender;

p.      The cessation of day-to-day operations of Debtors;

q.      Any loss of accreditation or licensing of Debtors that would materially impede or impair the Debtors' ability to operate as a going concern;

r.      The assertion by the Debtors (or any other party in interest) of claims arising under Code § 506(c) against the DIP Lender or the commencement of other actions adverse to the DIP Lender or its rights and remedies under this Order, or any other Bankruptcy Court order;

s.      Any material provision of this Interim Order for any reason ceases to be enforceable, valid, or binding upon the Debtors, or any party so asserts in writing;

t.      Debtors' failure to use commercially reasonable efforts to pursue sale and refinancing opportunities during the Initial Term;

u.      Debtors' failure to use commercially reasonable best efforts to pursue sale and refinancing opportunities during the Extended Term; and

v.      The entry of a Final Order that is agreed to by both the DIP Lender and Sun Life approving the Motion shall not have occurred within thirty (30) days after the Petition Date.

The term "Default" herein means the occurrence of any event which except for the passage of time or the giving of notice or both would constitute an Event of Default (as defined in the Loan

28

WA 7080269.5

Agreements or in this Order (other than those Defaults or Events of Default excepted in part (f) of this paragraph)).

14.    Remedies Upon Default.  Upon the occurrence of a Default or an Event of Default and after the Notice Period has expired and no applicable Court Order has been entered, the DIP Lender and/or Sun Life  may exercise its rights and remedies and take all or any of the following actions without further modification of the automatic stay pursuant to Code § 362 which is hereby deemed modified and vacated to the extent necessary to permit such exercise of rights and remedies and the taking of such actions and without further order of or application to this Court: (a) suspend all Post-Petition Financing and Loans to the Debtors, and enjoin and prohibit the Debtors from using Cash Collateral to the extent that such Default or Event of Default would permit such relief under the Loan Agreements, as amended hereby; (b) suspend amounts in any accounts maintained with the DIP Lender, or otherwise enforce rights against all or part of any Collateral in the possession of the DIP Lender to the extent that such Default or Event of Default would permit such relief under the Loan Agreements (as amended in this Order with additional notice periods and otherwise); and/or (c) subject to the provisions of Paragraph 12 above, take any other action or exercise any other right or remedy of the DIP Lender under the Loan Agreements, this Interim Order, or by operation of law.  Upon the Debtors' receipt of a Default Notice, the Debtors shall immediately cease making any disbursements pursuant to the Budget or otherwise, subject to further order of the Court after notice and a hearing.

15.    Reimbursement of DIP Lender's Costs and Fees.  Without further application to or order of this Court, and in consideration of other accommodations provided by the DIP Lender and Sun Life, the Debtors shall reimburse the DIP Lender and Sun Life for all reasonable out of pocket filing and recording fees, reasonable professional fees, and costs and expenses and

WA 7080269.5

internal audit fees and expenses incurred by the DIP Lender and Sun Life: (a) in the preparation
and implementation of this Interim Order and the various Loans and other Post-Petition
Financing; (b) in the representation of the DIP Lender or Sun Life in this proceeding; and (c) as
otherwise provided in the Loan Agreements. For the avoidance of doubt, the DIP Lender's Costs
and Fees contemplated by this paragraph are part of the Post-Petition Indebtedness.

16.    Good Faith Protections. Having been found to be extending credit and making
Loans to the Debtors in good faith, the DIP Lender and Sun Life shall be entitled to the full
protection of Code § 364(e) with respect to the Post-Petition Financing and the DIP Liens
created or authorized by this Interim Order in the event that this Interim Order or any
authorization contained herein is stayed, vacated, reversed or modified on appeal. Any stay,
modification, reversal or vacation of this Interim Order shall not affect the validity of any
obligation of the Debtors to the DIP Lender incurred pursuant to this Interim Order.
Notwithstanding any such stay, modification, reversal or vacation, all Loans made pursuant to
this Interim Order, all use of Cash Collateral and all other Post-Petition Financing incurred by
the Debtors pursuant hereto or the Loan Agreements prior to the effective date of any such stay,
modification, reversal or vacation, shall be governed in all respects by the provisions hereof and
the DIP Lender shall be entitled to all the rights, privileges and benefits of this Interim Order,
including without limitation, the DIP Lender Liens, and Superpriority Claims granted herein.

17.    Control Disclaimer.    The transactions contemplated by the Post-Petition
Financing are not intended to provide the DIP Lender or Sun Life with sufficient control over the
Debtors so as to subject the DIP Lender or Sun Life to any liability in connection with the
management of the Debtors' business or any of the Debtors' properties. By providing the Post-
Petition Financing or taking any actions pursuant to this Order, the DIP Lender and Sun Life

shall not: (a) be deemed to be in control of the operations or liquidation of the Debtors; or (b) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation, management or liquidation of the Debtors.

18.    Continuing Effect of Order.  The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order, including without limitation (a) confirming any plan of reorganization in any of these Chapter 11 Cases (and the Post-Petition Financing shall not be discharged by the entry of any such order or pursuant to Code § 1141(d)(4), the Debtors having hereby waived such discharge); (b) converting any of these Chapter 11 Cases to Chapter 7 cases; or (c) dismissing any of these Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the Superpriority Claims, and DIP Lender Liens granted pursuant to this Interim Order and Loan Agreements shall continue in full force and effect notwithstanding the entry of such order, and such Superpriority Claims, and DIP Lender Liens shall maintain their priority as provided by this Interim Order until all DIP Lender Indebtedness is indefeasibly paid in full and discharged.

19.    Additional Requirements.  The DIP Lender's obligations under this Interim Order are conditional upon and subject to (a) a reaffirmation by the Commercial Guarantors in form and substance satisfactory to DIP Lender of their respective Commercial Guaranties of any and all indebtedness of the Debtors to the DIP Lender; (b) the payment of $50,000 ("DIP Fee") which shall be advanced as part of, and included in, the Post-Petition Financing; and (c) delivery to the DIP Lender of evidence satisfactory to the DIP Lender that the Collateral is insured for the full replacement value thereof and the DIP Lender is named as loss payee and/or as additional insured on all insurance policies upon request of the DIP Lender. The DIP Lender may, at its sole discretion, retain additional third party consultants selected by the DIP Lender to review

matters pertaining to the business and properties of the Debtors, each at the Debtors' sole reasonable expense (collectively, the "DIP Lender's Consultants"). The Debtors will permit the DIP Lender's Consultants to examine the respective corporate, financial and operating records, and, at the Debtors' sole reasonable expense, make copies thereof, inspect the assets, properties, operations and affairs of the Debtors, visit any or all of the offices of the Debtors to discuss such matters with their officers, independent auditors, accountants or consultants (and the Debtors hereby authorize such independent auditors, accountants and consultant to discuss such matters with the DIP Lender's Consultants), and the Debtors will cooperate with the DIP Lender's Consultants in all respects; provided however that the Debtors reserve their right to claim that any such documents are protected under attorney client privilege to the extent permitted under applicable law.

20.    Stipulations, Releases and Waivers.

a.    Upon entry of this Interim Order, the Debtors' stipulations, releases and waivers contemplated in the findings of fact and conclusions of law shall be deemed binding upon the Debtors, their bankruptcy estates, and all other parties, including, without limitation, subsequent trustees, subject to Paragraph 20.b of this Interim Order. The Debtors' Stipulations above are binding upon the Debtors immediately upon entry of this Interim Order. Further, the guaranty obligations being granted in connection with the Post-Petition Financing are hereby deemed to be supported by good and valuable consideration.

b.    The findings, stipulations, releases and waivers contained above shall be binding upon Debtors' bankruptcy estates and all parties in interest, including without limitation, any statutory committees appointed in these Chapter 11 Cases, unless a party

WA 7080269.5

in interest (other than the Debtors) has properly filed an adversary proceeding or commenced a contested matter (subject to the limitations set forth in Paragraph 9.c.) challenging the amount, validity, enforceability, perfection or priority of the DIP Lender Pre-Petition Indebtedness or the DIP Lender's Pre-Petition Liens, or otherwise asserting any claims or causes of action against the DIP Lender and Sun Life relating to the DIP Lender Pre-Petition Indebtedness and the Sun Life Pre-Petition Indebtedness on behalf of the Debtors' estates, no later than the date that is forty five (45) days after entry of the Final Order (the "Challenge Deadline"), and the Court subsequently enters a judgment in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter.   If no such adversary proceeding or contested matter is properly commenced as of the Challenge Deadline, then the findings, stipulations, releases and waivers contained above shall be binding and the DIP Lender Pre-Petition Indebtedness and Sun Life Pre-Petition Indebtedness shall constitute an allowed fully secured claims, not subject to subordination and otherwise unavoidable.

c.      Subject only to the rights of set forth in paragraph 20(b), for all purposes in these Chapter 11 Cases and any subsequent Chapter 7 cases, the DIP Lender's liens on the DIP Lender Pre-Petition Collateral and Sun Life's liens on the Sun Life Pre-Petition Collateral shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination and otherwise unavoidable, and the DIP Lender, the DIP Lender Pre-Petition Indebtedness and the DIP Lender's liens on the DIP Lender Pre-Petition Collateral shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including without, limitation, any successor thereto.   If any such adversary proceeding or contested

WA 7080269.5

matter is properly commenced as of such date, the findings contained in the recital
paragraphs of this Interim Order shall nonetheless remain binding on all parties in interest
except to the extent that such findings were expressly challenged in such adversary
proceeding or contested matter.

21.     DIP Lender's Rights Not Prejudiced.  Except as expressly provided herein, this
Interim Order shall be without prejudice to any and all rights, remedies, claims and causes of
action which the DIP Lender may have against the Debtors or any third parties, and without
prejudice to the right of the DIP Lender to seek relief from the automatic stay in effect pursuant
to Code § 362, or any other relief in these Chapter 11 Cases, and the right of the Debtors to
oppose any such relief by contesting the existence of a Default or an Event of Default and as
otherwise consistent with the terms of this Interim Order, subject to Paragraphs 12 and 14 hereof.
In no event shall DIP Lender be subject to the equitable doctrine of "marshaling" or any other
similar doctrine with respect to any Collateral.

22.     Authorization to Perform Additional Acts.  The Debtors are authorized to perform
all acts, and execute and comply with the terms of such other documents, instruments and
agreements in addition to the Loan Agreements, as the DIP Lender may reasonably require, as
evidence of and for the protection of the Post-Petition Financing, or which otherwise may be
deemed reasonably necessary by the DIP Lender to effectuate the terms and conditions of this
Order and the Loan Agreements.

23.     Waivers.  In order to be effective any waiver by DIP Lender of the provisions of
this Interim Order or consent required under this Interim Order must be in writing, which
includes electronic mail.

24.     Financial Reporting and Inspection of Collateral.  Debtors shall provide a weekly report on actual revenue and expenses no later than Wednesday at 5:00 p.m. central time for the week proceeding the week in which the report is made.  Such report shall be in a form as mutually agreed to by Debtors and DIP Lender.  Further, Debtors shall provide DIP Lender their consolidated balance sheet and profit and loss statements no later than the 30th day of the month for the month proceeding the month in which the report is made. Additionally, DIP Lender and Sun Life shall have the right to examine all of Debtors' books and records and the Collateral, including bank records relating to prepetition and post-petition time periods, upon three (3) business days advance notice, during normal business hours.

25.     Successors and Assigns.  The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender, Sun Life, the Debtors, and their respective successors and assigns (including without limitation, any Chapter 11 or Chapter 7 trustee, examiner, or other fiduciary hereafter appointed for the Debtors or with respect to any of the Debtors' property).

26.     Conflicts.  To the extent there exists any conflict between the Loan Agreements, and the terms of this Order, this Order shall govern.

27.     Final Hearing and Response Deadline. The Final Hearing will be held on July ____, 2015 at _____.  The Debtors shall, on or before _____, 2015, mail copies of a notice of the entry of this Interim Order and the date of the Final Hearing, together with a copy of this Order to the parties having been given notice of the Preliminary Hearing, to any party which has filed prior to such date a request for notices with this Court and to any counsel for any statutory committee of unsecured creditors appointed pursuant to Code § 1102.  The notice of entry of this Order shall state that any party in interest objecting to the Post-Petition Financing

shall file written objections with the Clerk of the United States Bankruptcy Court for the

_____ District of _____, by no later than 5:00 p.m. (cst) on _____, 2015. Objections

shall be served so that the same are received on or before such date and time by: (a) counsel for

the Debtors; (b) counsel for the DIP Lender and Sun Life, and (d) the Office of the United States

Trustee.

       IT IS SO ORDERED.

Dated: July __, 2015.

                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

WA 7080269.5

STIPULATED AND AGREED:

STINSON LEONARD STREET LLP

By: _____

Paul M. Hoffmann MO # 31922
Patrick R. Turner NE # 23461 (*pro hac* pending)
Nicholas J. Zluticky MO # 61203
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
paul.hoffmann@stinsonleonard.com
patrick.turner@stinsonleonard.com
nicholas.zluticky@stinsonleonard.com

PROPOSED COUNSEL FOR THE DEBTORS

SPENCER FANE BRITT & BROWNE LLP

By:_____

Scott J. Goldstein, Esq. MO # 28698
Eric L. Johnson, Esq. MO # 53131)
1000 Walnut Street
Kansas City, Missouri 64106
Telephone: (816) 478-8100
Facsimile: (816) 471-6467
sgoldstein@spencerfane.com
ejohnson@spencerfane.com

ATTORNEYS FOR UMB BANK, N.A.

DUANE MORRIS LLP

By:_____

William C. Heuer
1540 Broadway
New York, NY 10036-4086
Telephone: (212) 692 1070
Facsimilie: (212) 208 4521
wheuer@duanemorris.com
ATTORNEYS FOR SUN LIFE ASSURANCE COMPANY OF CANADA

37

## EXHIBIT A – Primed Collateral

1.  11919 Fort St., Omaha, NE, legally described as: *[To be provided];*

2.  611 East Broadway, Council Bluffs, IA, legally described as: *[To be provided];*

3.  503 9th Avenue, Council Bluffs, IA, legally described as: *[To be provided];*

4.  1200 Locust, Glenwood, IA, legally described as: *[To be provided].*

WA 7080269.5

## EXHIBIT B – Initial Budget

**[to be presented at initial hearing]**

**EXHIBIT C – Performance Milestones**

| Performance Milestone | Date |
| --- | --- |
| $800,000 EBITDA | Six Month Milestone (January 4, 2016) |
| $925,000 EBITDA, Debtors continue to demonstrate performance at such a level such that 2016 EBITDA would exceed $1.5 million, or any amount otherwise agreed to by DIP Lender and Sun Life in writing. | Nine Month Milestone (April 4, 2016) |

WA 7080269.5