# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | Case No. BK 15-XXX |
| GAS-MART USA, INC., | ) | (Proposed Lead Case) |
| | ) | |
| Debtor. | ) | Chapter 11 |

___

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | Case No. BK 15-XXX |
| AVING-RICE, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| *Joint Administration Requested* | ) | |

___

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | Case No. BK 15-XXX |
| FRAN TRANSPORT & OIL CO., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| *Joint Administration Requested* | ) | |

___

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | Case No. BK 15-XXX |
| G&G ENTERPRISES, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| *Joint Administration Requested* | ) | |

___

**DECLARATION OF JOHN TITTLE, JR., CHIEF EXECUTIVE OFFICER,
IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY PLEADING**

I, John Tittle, Jr., declare as follows

1.    I am the Chief Executive Officer of Gas-Mart USA, Inc. ("Gas-Mart"), Aving-Rice,

LLC ("Aving-Rice"),  Fran Transport & Oil Company ("Fran"), and G&G Enterprises, LLC

("G&G") (jointly and severally, the "Debtors"). In these capacities, I am familiar with Debtors' day-to-day operations, business and financial affairs, and books and records.

2. To enable Debtors to minimize the adverse effects of the commencement of the above-captioned chapter 11 cases (the "Chapter 11 Cases") on their business, thereby preserving and maximizing the value of their estates, Debtors have requested various types of relief in the "first day" pleadings and applications (each, a "First Day Pleading") described below.[1] I am familiar with the contents of each First Day Pleading (including the exhibits and schedules thereto) and I believe that the relief sought in each First Day Pleading: (a) is necessary to enable Debtors to operate in Chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful result in these chapter 11 cases; and (c) is in the best interests of Debtors' estates and their creditors.

3. Except as otherwise indicated, all facts set forth herein are based upon: (a) my personal knowledge; (b) information learned from my review of relevant documents; and (c) information supplied to me by other members of Debtor's management and advisors. I am authorized to submit this Declaration on behalf of each Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I.    BACKGROUND

4. On July 2, 2015 (the "Petition Date"), Debtors filed their voluntary petitions in this Court for reorganization relief under Chapter 11 the Bankruptcy Code, commencing each Debtor's Chapter 11 Case. Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No request for the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in their respective First Day Pleading.

2

appointment of a trustee or examiner has been made in these Chapter 11 Cases and, as of the date of the filing of this Declaration, no official committees have been appointed or designated.

### A. Current Business of Debtors.

5. Gas-Mart and Aving-Rice own and operate gasoline station/conveniences stores ("C-Stores"). In addition, Gas-Mart presently leases and operates seven C-Stores from independent third parties. With locations in Iowa, Illinois, Indiana, Nebraska, and Wisconsin, Gas-Mart and Aving-Rice operate 22 and 20 stores, respectively, as of the Petition Date. Gas-Mart also owns and operates a wholesale fuel business distributing gasoline and diesel to other C-Stores as well as other third party commercial ventures.

6. As of the Petition Date, G&G owns and leases ATM's to the 42 Gas-Mart and Aving-Rice locations as well as certain ConocoPhillips ("Phillips") locations in the greater Kansas City Area ("Kansas City"). In May 2015, an office building previously owned by G&G was sold to a third party for $2.3 million including seller financing of $400,000. The balance of the proceeds of $1.9 million was used to satisfy closing costs, taxes, and the secured debt on the property. Upon the closing of the office building transaction, Gas-Mart entered into a five year lease for 4,652 square feet at a monthly cost of approximately $8,500 per month.

7. Fran is a fuel hauling business located in and serving Kansas City. Historically, Fran transported fuel primarily for the Gas-Mart locations in Kansas City after the business was relocated from Omaha, NE in June 2013. Since March 1, 2015, Fran has hauled and delivered fuel for 36 Phillips C-Stores in the Kansas City and, since the closing of the sale by Gas-Mart of its 19 Kansas City locations to TravelCenters of America ("TA") on April 30, 2015, discussed further below, Fran now provides hauling services to TA as well. Accordingly, all of the fuel purchased by Gas-Mart and Aving-Rice is transported by common carriers.

8. Debtors currently have over 300 employees, and over 700 creditors. Gross revenues for Debtors in 2014 were over $338 million, but after the TA sale, projected gross revenues for 2015 are about $200 million. Debtors have total alleged secured claims of about $25 million, more than $9 million in priority claims, and unsecured non-priority claims over over $12 million.[2]

9. Debtors primary fuel supplier is Phillips, who provides fuel for 24 locations, with Citgo providing fuel for 13 locations. The remaining locations are not branded and obtain fuel from other suppliers. One location does not sell fuel – it is a liquor store.

### B. History of Debtors

10. Gas-Mart was founded in 1995 and completed construction on its first store in early 1996. By 2003, Gas-Mart completed construction from the ground up on seven C-Stores located in and around Kansas City. As a result of these "greenfield" locations as well as certain acquisitions, the business grew to 18 C-Stores and three additional vacant sites by the end of 2003.

11. In early 2004, the Gas-Mart acquired 28 sites from Phillips located in three states (Illinois, Wisconsin and Indiana). In 2005 a location was built in Kansas City from the ground up on one of the vacant sites purchased in 2003. In 2006, Gas-Mart added seven additional stores, located in two new states (Iowa and Nebraska), as well as a new business line, the distribution of wholesale fuel. The stores acquired in 2004 and 2006, along with certain Gas-Mart stores in Kansas City, were refinanced with a $42 million financing package provided by Sun Life Assurance Company of Canada ("Sun Life") which closed on March 22, 2007. Other individual stores were financed though Sun Life subsequent to placement of the 2007 facility as well as the refinancing of the G&G office building for $2.2 million which occurred on October 5, 2007.

---

[2] These are estimates based on books and records. More accurate information will be included in Schedules to be filed in the cases.

12. Gas-Mart continued its growth in 2012 with the acquisition of 41 locations in Southern Illinois for over $13 million through a newly established entity, Aving-Rice, continuing the use of the trade name "Jumpin' Jimmy's.". This transaction was financed through St. John's Bank ("St. John's Bank") and SNC JJ Holdings, LLC, an affiliate of Silver Point Capital ("Silver Point") for about $7 million and $6 million, respectively. Seven of the Jumpin' Jimmy's locations subsequently were sold.

13. Also in 2012, Gas-Mart added two Kansas Turnpike locations (the "Turnpike Stores"), pursuant to agreements with the Kansas Turnpike Authority (the "KTA"), and managed for Phillips an additional 36 stores located in Kansas and Missouri, bringing the Debtors' total store count to 108. The principal investments made by Gas-Mart with regard to the Turnpike Stores included the provision of the pumps, tanks, and canopy as well as all inventories, both inside merchandise and fuel. The structure involved in the managing of the Phillips locations evolved over time but could generally be characterized as Gas-Mart managing the locations and providing the inside merchandise with Phillips supplying the fuel, paying the Company a management fee, and both parties dividing the resulting positive cash flow. These locations are characterized by the Company as the "Fee Op Stores." Acquisition of inventory for the Fee Op Stores was a major investment and outlay of cash in late 2013 as the arrangement with the Fee Op Stores evolved.

14. I note that the Debtors more than doubled the number of stores which they managed within a period of less than one year. This blistering pace of growth and the associated debt would prove to be an issue for the Debtors going forward

**B.    Historical and Current Ownership Structure**

15. Gas-Mart is a Missouri corporation. Aving-Rice is an Illinois limited liability company. Fran is a Kansas corporation. And G&G is a Kansas limited liability company. The sole directors of Gas-Mart and Fran are David George and Michael George. The sole General Manager

5

of Aving-Rice and G&G is David George. David George and Michael George collectively own or control more than a twenty percent (20%) ownership interest in each of the Companies. The other equity owners in Gas-Mart, Fran and G&G are members of the family of Abe Gustin, who was active in the formation and early operations of the Debtors but died in 2010. The other equity owner of Aving-Rice is the GSN Irrevocable Trust under the control of a third party investor.

16. With Gas-Mart's origins in 1995, the George family combined with members of the Gustin family, including one of the founders of Applebee's International, Inc., Abe Gustin, to develop the Debtors' chain of C-Stores by completing construction of its first store in 1996. Mr. Gustin assisted Gas-Mart as, among many things, a loyal and trusted advisor but was rarely involved in the day-to-day operations of Gas-Mart. Sometime prior to Mr. Gustin's death, the George and Gustin families entered into a buy-sell agreement relative to the shares of stock of Gas-Mart. A value of $1.275 million was established as part of the buy-sell agreement for each of the holdings of the George and Gustin families. However, the Gustin family is now disputing this agreement.

17. Shortly after the death of Mr. Gustin in 2010, the Gustin Family brought litigation against Gas-Mart and the George Family in 2011 claiming that the buy-sell agreement was not valid and demanding payment for their stock in excess of the $1.275 million figure as set out in the document. This litigation has morphed and expanded over the years to include G&G and has escalated to the point that the Gustin family has recently sought $28 million for their interest. Besides this astronomical demand, the litigation has caused the Debtors to expend around $1 million in fees and waste countless hours consumed by this meaningless and spurious endeavor. As financial advisor, and now CEO, I have expended a fair amount of time responding to and meeting with counsel to the Gustin family. At a time beginning in 2012 when the Company took

6

on too much expansion at one time with limited capital, this was another unnecessary distraction which kept management from focusing on what was important – the profitable operation of the C-Stores

18. Matters grew worse when the Debtors needed shareholder approval for the TA Sale, discussed further below. The only way that the Gustin family would provide their consent was to install a Custodian pursuant to an order entered in the state court lawsuit (the "<u>Custodian Order</u>") for all the Debtors (even though only Gas-Mart was a named party) to act as their "watchdog." This Custodian makes no decisions, provides no assistance, and has added no value to the Debtors or the turnaround of the Debtors. Instead, he occupies an office at the headquarters and periodically makes inquiries that waste my time as well as that of the Company's Chief Financial Officer while drawing $7,500 per week that the Debtors cannot afford. Accordingly, as of the Petition Date, the Debtors terminated the presence and payment of the Custodian.

### C. Historical and Current Management Structure

19. From the beginning until his departure in April, 2015, Jim George ran the day to day operations of the Debtors. As a consultant appointed by Abe Gustin to control the day to day operations, Mr. George was apparently very successful in running the Debtors operations prior to 2012. However, his management style and skills were severely tested after the acquisitions in 2012, leading to his departure as part of the TA Sale and Custodianship in 2015.

20. After the acquisitions in 2012 noted above, the Debtors were highly-leveraged and had great difficulty in servicing their debts. This led to a variety of challenges in paying all of Debtors' obligations in the ordinary course of business. The first major challenge was timely payment of fuel and sales taxes to the Illinois Department of Revenue ("IDOR") starting in late

7

2012 of over $2.5 million. This is a challenge that has continued to the Petition Date, and is described further below.[3]

21.    A further challenge arose in January of 2014 when the Debtors overdrafted their accounts with UMB Bank, N.A. ("UMB") in the aggregate amount of about $7.8 million. This led to Debtors entering various loan documents with UMB granting liens on various assets. The same thing happened with Wells Fargo Bank National Association ("Wells Fargo") in July, 2014, with overdrafts in the aggregate amount of about $5 million. This led to Debtors entering various loan documents with Wells Fargo granting liens on various assets.

22.    The overdraft position with Wells Fargo also resulted in entry into a Forbearance Agreement. The terms of the Forbearance Agreement were very draconian and provided for, among other things, the retention of a third party Financial Advisor "to assist Gas-Mart in the sale of its assets and/or the refinance of the company's secured debt." The Financial Advisor engaged under this Forbearance Agreement resigned after about a month and after having been paid over $120,000. Upon the termination of the engagement of the prior Financial Advisor, the TAG Engagement began.

23.    I was initially employed by the Debtors pursuant to an agreement by and between the Debtors and Tittle Advisory Group, Inc., a New York corporation of which I am the CEO and sole shareholder ("TAG"), dated October 8, 2014 (the "TAG Engagement Letter" with the matter being termed the "TAG Engagement"). Details of that engagement are discussed below. After completion of that engagement, I personally entered an Executive Employment Agreement with Debtors dated April 9, 2015 pursuant to which the TAG Engagement was terminated and I became the Chief Executive Officer of the Debtors, a capacity I continue to hold as of the date of my

---

[3] However, Debtors currently anticipate timely payment of all fuel and sales taxes to all states after the Petition Date.

execution of this Declaration. As Chief Executive Officer, I am generally responsible for the management and operations of the Debtors, subject to the Custodian Order discussed above.

### C. The Workout/Sale Process That Began in the Fall of 2014.

24. According to the TAG Engagement Letter, TAG was to serve and did serve as Financial Advisor involving the sale of certain of the Debtors' locations and related assets through canvassing prospective purchasers, obtaining executed nondisclosure agreements in cooperation with Debtors' legal counsel, soliciting proposals from prospective purchasers, negotiating terms and documentation in cooperation with Debtors' legal counsel, making recommendations to the Debtors concerning the proposal(s) submitted, and supporting the due diligence process through to closings. This endeavor shall be collectively referred to hereinafter as the "Sale Process" and the time period required to conduct the Sale Process shall be the "Sale Period."

25. During the Sale Period, TAG was the primary point of contact involving inquiries from, and dissemination of information to, prospective purchasers. In addition to conducting the Sale Process, TAG monitored cash flow and prepared weekly cash flow analyses and forecasts as well as consulted with the Debtors regarding recommendations to improve cash flow as a means of ensuring the sustainability of cash throughout the Sale Period. In addition, during the Sale Period, TAG negotiated with the majority of the Company's lenders as well as the landlords of certain properties that involved sale/leaseback transactions that had been consummated some years prior for which the underlying lease payments had become out-of-market and unsustainable.

26. At the time of TAG's retention, the financial condition of the Debtors was very negative. Specifically:

(i) a number of the stores were (and are currently) underperforming;

(ii) the acquisition of the Jumpin' Jimmy's stores had not gone well, and in fact, Aving-Rice was and is in litigation with Silver Point Capital (the "Silver Point Litigation");

(iii) street work in certain locations had diminished ingress and egress into some of the stores and few efforts had been expended to combat the resulting decline in business;

(iv) one of Gas-Mart's dealers unilaterally de-branded a store with the result that the location became the subject of litigation with Gas-Mart being ordered to repurchase and rebrand the site at significant cost upon the conclusion of the case (the "Re-Branded Store");

(v) North American Savings Bank, the lender involved with the Re-Branded Store, foreclosed on that property, took a deed-in-lieu, and Gas-Mart has now negotiated a lease to continue to operate the store;

(vi) while assimilating the Jumpin' Jimmy's stores, the Debtors agreed to take on the Fee Op Stores, and as a result, collectively with the Jumpin' Jimmy's locations, the Debtors more than doubled the number of locations that they were managing with no real cash resources to support this activity;

(vii) with limited to no cash resources, there was no additional infrastructure added to the Debtors other than the employment of one additional person in the main office;

(viii) inventory transactions involving these locations ended up costing the Company several million dollars in the fall of 2013; and

(ix) beset by these problems, the operations of the Company's stores declined, further exacerbating the cash flow and liquidity problems in 2013 and 2014.

27. While all of the above events were in play, during August, 2014, the IDOR issued a levy on Gas-Mart that, when coupled with the above factors, created a "perfect storm," which had devastating effects, including:

(i) CITGO, the Company's major fuel supplier in Illinois, placed a credit hold on Gas-Mart's account which prevented the purchase of fuel for Gas-Mart's Illinois locations for approximately three and one-half weeks. This triggered a domino effect with major grocery suppliers - Farner-Bocken, Pepsi, Coke, Fritos, etc. Normal vendor terms were eliminated and discounts and allowances were not realized during this period. Moreover, Gas-Mart lost foot traffic in its Illinois stores that it has yet to regain;

10

(ii) The IDOR levy placed on the Gas-Mart's bank account caused significant strain on the Debtors' operations outside of Illinois, which affected the Debtors' ability to bring current its other outstanding tax liabilities;

(iii) The IDOR levy also triggered discussions regarding the termination of contracts with Phillips and the KTA (the Company did in fact lose the two turnpike locations during February 2015 as noted herein below)

(iv) The Debtors were involved in negotiations with other major grocery wholesale companies which stopped abruptly as a result of the IDOR levy; and

(v) The Debtors were working to obtain a $3 million loan to pay the IDOR in full at the time of the levy, and when the levy was placed on the bank account, the bank considering the loan tabled and ultimately denied the loan.

28. With the Debtors already spiraling downward as noted above, the damage done to the Debtors' financial position and ability to pay their debts as a result of the levy imposed by the IDOR cannot be discounted. Without the successful conclusion of the Sale Process as noted herein below, the Debtors would have had to file far more disorganized bankruptcy cases in April 2015.

29. During the Sale Process, the Debtors' assets were exposed to numerous potential buyers, both financial and strategic. By the end of January 2015, the Debtors had entered into letters of intent, or purchase and sale agreements, involving the following

(i) A sale of the Debtors' 19 Kansas City locations to TA (the "TA Sale");

(ii) A sale of two locations in Council Bluffs, IA to Buck's (the "Buck's Sales"); and

(iii) A sale/leaseback of 11 locations to Spirit Realty (the "Spirit Sale/Leaseback").

30. The Spirit Sale/Leaseback, in the amount of $13.7 million, would have allowed, among other things, the satisfaction in full of the Debtors' projected indebtedness to the IDOR. However, upon the exit of the Chief Operating Officer of Spirit Realty at the end of February 2015, Spirit Realty elected not to pursue the Spirit Sale/Leaseback in any respect as it had decided to move away from the gasoline station/convenience store industry. This withdrawal of Spirit Realty led to significant negotiations with the Debtors' lenders as two lenders in particular, UMB Bank

11

and Wells Fargo, which had been expecting to be paid in full, were to receive partial payments through the consummation of the TA Sale and Buck's Sales. Negotiations with the Company's lenders, including Sun Life which at the time was owed $25 million, were successful and paved the way for the closing of the TA Sale for $27 million, or approximately 97% of appraised value, on April 30, 2015.

31. All of the proceeds of the TA Sale were used to pay taxes and debt that was associated with the properties being sold. The Sun Life indebtedness was further reduced by approximately $2 million on May 6, 2015 through the sale of the office building owned by G&G. During June 2015, UMB was paid $.5 million and Sun Life $3.8 million as a result of the Buck's sales. As with the TA Sale, the Buck's Sales as well as the G&G sale transaction (involving the Gas-Mart headquarters building) were at or near current appraised value.

**D. The Subsequent Decision to Commence These Cases**

32. Debtors' significantly de-leveraged their Balance Sheet through the above Sale Process. As of the Petition Date, Gas-Mart owes approximately $11.4 million to its lenders, including a $1.25 million prepayment amount to Sun Life, about $34 million less than prior to the start of the Sale Process. Also as of the Petition Date, Aving Rice owes St. John's approximately $5.8 million, composed of a term loan with a balance of about $2.4 million and a principal amount of about $3.4 million on a matured line of credit. The amount due Silver Point, currently in dispute, is carried on the books and records of Aving-Rice at $5.8 million with Silver Point alleging that the actual liability is $8 million.

33. While the Debtors had de-leveraged their Balance Sheet, it became clear during the Sale Period that the Debtors' operations, particularly the remaining stores after the aforementioned sales, needed to be turned around. To be clear, I was not charged with turning around the Debtors

12

during the majority of the Sale Process. That changed on April 9, 2015, when I was appointed Chief Executive Officer of the Debtors. Since the closing of the TA Sale on April 30, 2015, I have endeavored to turn around the Debtors.

34. However, I have encountered or have had to deal with the following road blocks that are impeding our progress and jeopardizing the very viability of the Debtors:

(i) The loss of income (estimated at $150,000 per month per store) relating to the Turnpike Stores due to the confiscation without required notice of these locations by the KTA in February 2015;

(ii) The burden of attempting to make installment payments on the approximate $7 million debt to the IDOR, for sales and fuel taxes, while continuing to remain current with IDOR on a prospective basis. Gas-Mart disputes the $7 million amount but the IDOR is threatening legal action with the result that Gas-Mart and Aving Rice could lose their ability to conduct business in the State of Illinois. This would be disastrous to the Debtors who have over 70% of the C-Stores located in Illinois;

(iii) The inability to buy sufficient quantities of groceries and inside merchandise items for the C-Stores due to the Debtors' grocery supplier, Farner-Bocken, not providing inventory since March 2015 with the Debtors scrambling to fill the stores with replacement vendors on a cash-in-advance basis;

(iv) The expensive and time-consuming litigation involving the Gustin family; and

(v) The impending judicial foreclosure by Silver Point on the locations that they financed for Aving-Rice as a result of the Silver Point Litigation

35. As to the last point regarding the Silver Point litigation, Aving-Rice has been in litigation in Illinois for some time with regard to the debt on certain stores with Silver Point demanding payment on this debt and Aving-Rice asserting that Silver Point made serious misrepresentations in connection with the sale of these stores to Aving-Rice. Due to problems with the stores, including the necessity of pulling the gasoline tanks in certain locations resulting in the loss of the ability to sell fuel, and accounts receivable purchased by Aving-Rice in the transaction that proved to be worthless, Aving-Rice refused to make any further payments on the Silver Point debt unless it received an adjustment to the purchase price. Silver Point dismissed the overtures of

Aving-Rice and instituted litigation (the "Silver Point Litigation") in state court in Effingham, IL (the "Effingham Court") to collect the debt and foreclose on the stores. Earlier this year, the Effingham Court ruled that Silver Point could enforce its liens and begin to foreclose on the stores in question.

36. Aving-Rice filed a motion in the Effingham Court for the judge to reconsider his ruling. On June 24, 2015, an order was entered denying the motion to reconsider and appointing a selling officer. It is estimated that the sale will be published for three weeks with the properties likely going to sale in the middle of July. These Chapter 11 cases were filed to ensure that the sale of the aforementioned properties would be stayed.

## II.  First Day Pleadings

37. I have reviewed the other pleadings filed contemporaneously with this Declaration. To the best of my knowledge, information and belief, the facts alleged in those pleadings are true and correct, and I would so testify if called as a witness. In addition, I note that the Debtors will suffer immediate and irreparable harm if the "first day" relief requested in those pleadings is not granted. Accordingly, I support the relief requested therein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 2, 2015

_/s/ John Tittle, Jr._
John Tittle, Jr.